**William BROWN, Appellant,**

v.

**Gerald FREY, Captain Ronald Kennedy, J.P. Smith, Larry Bogan, Mike Bowersox and Missouri Dept. of Corrections and Human Resources, Appellees.**

No. 86–1383.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 11, 1986.
Decided Dec. 24, 1986.

Vincent Caracci, St. Louis, Mo., for appellant.

Winfield Sinclair, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before ARNOLD, Circuit Judge, BRIGHT, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

William Brown appeals from a judgment denying his section 1983 claim. His claim arises from the revocation of his presumptive parole date resulting from a determination that he committed "riot" at the Missouri Eastern Correctional Center. Brown argues that the district court[1] erroneously concluded that Brown was afforded procedural due process in the adjustment board proceeding in which he was deprived of a liberty interest. He contends that the proceeding was deficient in two respects: (1) the adjustment board failed to provide a constitutionally sufficient written statement of the evidence relied on and the reasons for the disciplinary action; and (2) the adjustment board's decision is not supported by "some evidence in the record." We affirm the judgment of the district court.

On March 13, 1984, Brown was a resident of Wing D at the Missouri Eastern Correctional Center. That evening Officers Kemp, Brown, and Lewis saw two residents of Wing D moving a chair from one room to another in violation of the institution's rules. When the officers ordered that the chair be returned, the residents demanded an explanation and started an argument. Approximately forty of the fifty residents in the wing, including Brown, came into the hallway to see the incident, which was taking place just outside Brown's room. The officers ordered the residents to return to their rooms, and after the arrival of some higher officials, the residents did return to their rooms and normalcy returned to Wing D.

Officers Kemp, Brown, and Lewis prepared a joint memorandum describing the chair-moving incident. The memorandum identifies Brown along with five other residents as the source of a statement encour-

---

1. The Honorable Robert D. Kingsland, United States Magistrate for the Eastern District of Missouri.

aging the residents to remain in the hallway until they were allowed to see the shift commander.[2] Brown was later interviewed by Officers Kennedy and Delo. After the interview, a conduct violation report[3] was prepared charging Brown with a violation of institutional rule 5, which prohibits "riot."[4]

Brown was then transferred to the Missouri State Penitentiary, where he was placed in segregation pending hearings before the classification treatment team and the adjustment board. After listening to Brown's version of the chair-moving incident, the classification treatment team referred the matter to the adjustment board and recommended that if found guilty Brown should be permanently transferred to the Missouri State Penitentiary, his presumptive parole date of September 16, 1985 should be revoked, and his conditional release date should be extended.

The adjustment board hearing was held on March 20, 1984 before a panel consisting of Appellees Bogan, Bowersox, and Smith. The hearing was tape recorded as a matter of department policy. At the hearing a member of the panel first read the charges asserted against Brown in the conduct vio-

lation report, read Brown's denial of guilt in the report, and read the recommendations of the classification treatment team. The board then questioned Brown, who repeated his version of the chair-moving incident. When asked to comment on the joint memorandum written by Officers Kemp, Brown, and Lewis, Brown disagreed with the officers' version of the incident, once again contending that he played no role in the disturbance. After listening to this testimony and considering that Brown had received his high school equivalency degree, started taking college courses, acted as a tutor while at the Correctional Center, and received no conduct violations during the prior nine months, the board found Brown guilty and approved the sentencing recommendation of the classification treatment team. The adjustment board's action was subsequently approved by Gerald Frey, and on May 24, 1985, Brown was notified by the Missouri Board of Probation and Parole that his presumptive parole date of September 16, 1985 was cancelled.

Brown received a written statement from the adjustment board, which stated that the board relied on the following in reaching its decision:

2. The paragraph in the joint memorandum that expressly implicates Brown states:

> Officer Brown then told the residents that they were not going to see the shift commander, and to return to their rooms. This was done twice by [Officer] Brown and twice by Kemp. Resident Adcox then began to tell the other residents "Fuck them, we're not going anywhere until we see the shift commander.["] Residents Nathan Williams, William Brown, Adcox, James Gannaway, Robert Wheeler, and Harold Kelly told the other residents that "the motherfuckers are wrong so let's don't go nowhere until we see the shift commander.["] Other residents then began to yell and rally around the other residents.

The final sentence in the memorandum also implicates Brown. After listing those residents not involved in the disturbance (a list that does not include William Brown), the memorandum states: "All other residents were participants and refused to dispurse [sic] when ordered."

3. The conduct violation report states that the following events occurred:

> Resident Brown engaged with several other residents in a disturbance protesting the enforcement of a published institutional rule

against moving furniture around in the unit. Resident Brown further incited other residents to join the protest and refused to return to their rooms when ordered to do so. Resident Brown stated to the Investigator, CS I Kennedy that he came out of his room when the disturbance started because "I live there and when things like this happen, I have to because I live here". The above also places Resident Brown in violation of Rule # 10–Creating a Disturbance, Rule # 12–Disobeying an Order and Rule # 28–Violation of Institutional Rules.

4. Rule 5 states:

> An inmate commits riot when he/she intentionally or recklessly causes or creates a great risk of alarm; assembles one or more inmates for the purpose of engaging in conduct which threatens the good order and security of the institution; advocates, urges or organizes one or more inmates to engage in tumultuous or violent conduct of a kind likely to cause alarm; incites, instigates, organizes, connives at, causes, aids, alerts, or assists, or takes part in any disorder, strike or other organized disobedience to the rules and regulations of the institution.

"1. Relied on CV & additional report

2. No CV's for past 9 months

3. Relied on # 5 definition."

Brown brought an action under 42 U.S.C. § 1983 claiming that he was deprived of a liberty interest without being afforded due process in the adjustment board proceeding. Among other things, Brown made the claims he now asserts: that the adjustment board failed to provide Brown a consitutionally sufficient written statement of the evidence relied on and the reasons for the disciplinary action, and that the board's conclusion that Brown committed "riot" is not supported by "some evidence in the record."

As to the first claim, the district court concluded that "although sparse, the statement of findings and evidence relied on by the adjustment board is sufficient * * * to comport with the minimal requirements of procedural due process * * *." *Brown v. Frey*, No. 84–1082–C(6), slip op. at 12 (E.D.Mo. Feb. 12, 1986). The district court also rejected Brown's second claim, concluding that there was some evidence in the record—namely, the statements in the joint memorandum prepared by Officers Kemp, Brown, and Lewis and the conduct violation report—to support the adjustment board's decision. *Id.*

Appellees do not dispute Brown's contention that the adjustment board proceeding against Brown resulted in the deprivation of a state-created liberty interest, thus mandating that the proceeding comport with the procedural requirements of the fourteenth amendment due process clause. Accordingly, we consider Brown's two claims. We hold, first, that the adjustment board provided Brown a constitutionally adequate written statement of the evidence relied on and the reasons for the disciplinary action, and, second, that the adjustment board's decision is supported by "some evidence in the record."

## I.

*Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), established the constitutional requirement that in a prison disciplinary proceeding resulting in the deprivation of a liberty interest "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Wolff*, 418 U.S. at 564, 94 S.Ct. at 2979 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972)). The written statement requirement serves two interrelated purposes. First, the requirement prevents arbitrary action by disciplinary boards; it "helps to insure that administrators * * * will act fairly." *Id.* at 565, 94 S.Ct. at 2979. Second, the written statement requirement facilitates review of the disciplinary proceeding by those reviewing bodies having penological concerns—such as officials considering whether to transfer an inmate to another institution and parole boards making parole decisions—as well as those reviewing bodies more interested in the fairness and constitutional propriety of the proceeding—for example, state officials, the public, and the courts. *Id.*

As with any prisoner's procedural due process rights, Brown's procedural due process rights are limited in scope and exist only to the extent that his constitutional liberty interest outweighs the interests of the penal system and the public. *E.g., Polizzi v. Sigler*, 564 F.2d 792, 798 (8th Cir. 1977). The Supreme Court has already concluded, of course, that this balancing test mandates the *Wolff* written statement requirement. Still, it is instructive to review the Supreme Court's analysis of these competing interests as we consider whether the written statement in question meets the *Wolff* written statement requirement.

An inmate is undoubtedly deprived of a liberty interest when he is deprived of state-created "good time credits." But the revocation of good time credits is "not comparable to a criminal conviction," *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 536 (1985), nor does it yield the degree of deprivation a parolee experiences when his parole is revoked.

*Wolff,* 418 U.S. at 560–61, 94 S.Ct. at 2977. The *Wolff* Court explained:

> For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole will be affected; and if parole occurs, the extension of the maximum term resulting from loss of good time may affect only the termination of parole, and it may not even do that. The deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance. But it is qualitatively and quantitatively different from the revocation of parole or probation.

*Id.*

This limited liberty interest is countered by the administrative costs and burdens a penal institution encounters, and society pays for, when a disciplinary board must provide in every case before it a written statement of the evidence relied on and the reasons for the disciplinary action. Prison disciplinary proceedings are unlike any other in a free society. They "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." *Id.* at 561, 94 S.Ct. at 2977. Prison officials are burdened by conflicting demands as they seek to implement the disciplinary process to assure institutional safety and foster rehabilitation. Officials may be beset by a backlog of cases triggered by, as in the case before us, a single incident necessitating numerous disciplinary proceedings, or, perhaps more commonly, the tension and the feelings of frustration, despair, and resentment in a penal institution may have led to numerous, unrelated incidents, each requiring disciplinary action. In each case "it may be essential that discipline be swift and sure." *Id.* at 563, 94 S.Ct. at 2978. Yet, prison officials must take steps and devise methods to assure that in every case each inmate is afforded his full panoply of constitutional rights.

It is against this backdrop that the Supreme Court has refused to require prison disciplinary boards to provide written explanations for certain actions, even though the actions could well lead to an ultimate finding of guilt instead of innocence. For example, in *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the Court held that a disciplinary board is not required to explain in writing why an inmate was denied the opportunity to confront and cross-examine witnesses. *Id.* at 322, 96 S.Ct. at 1560. More recently, the Court, in *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985), held that due process does not require that the reasons for refusing to call witnesses requested by an inmate at a disciplinary hearing be placed in writing. *Id.,* 105 S.Ct. at 2196–97. The Court stated:

> But the primary business of prisons is the supervision of inmates, and it may well be that those charged with this responsibility feel that the additional administrative burdens which would be occasioned by such a requirement detract from the ability to perform the principal mission of the institution. While some might see an advantage in building up a sort of "common law of the prison" on this subject, others might prefer to deal with later court challenges on a case-by-case basis. We hold that the Constitution permits either approach.

*Id.*

The *Wolff* written statement requirement obviously precludes a prison disciplinary board from choosing "either approach" when it comes to explaining the evidence relied on and the reasons for the disciplinary action; there must be a written statement drafted contemporaneously with the

disciplinary action. Still, the balance between the penological interest in avoiding excessive administrative burdens in order to use disciplinary proceedings to assure institutional safety and promote rehabilitation, on the one hand, and the interests of the individual inmate, on the other, is such that the due process clause does not require "technical and detailed disciplinary reports." *Wilson v. State of Iowa,* 636 F.2d 1166, 1168 (8th Cir.1981). The requirement is satisfied if the written statement, even though "sparse in content," is "sufficient to inform [the inmate] of the evidence relied upon by the factfinders in reaching their decision to take disciplinary action." *Jensen v. Satran,* 688 F.2d 76, 78 (8th Cir.1982), *cert. denied,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983). This ensures that disciplinary boards will not act arbitrarily, and it forces a disciplinary board to commit itself, contemporaneously with its decision, to certain evidence, thus allowing a reviewing body to fairly and accurately review the incident that led to the proceeding or the proceeding itself. After this, due process requires no more, and it certainly does not dictate that we expose a disciplinary board's written statement to such extensive scrutiny that we fail to adequately respect "the legitimate institutional needs of assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation." *Hill,* 105 S.Ct. at 2774.[5]

■ We agree with the district court that, although sparse in content, the adjustment board's written statement of the evidence relied on and the reasons for the disciplinary action against Brown meets the requirements of due process. The statement indicates that the board relied on the conduct violation report as well as the additional report—the joint memorandum written by Officers Kemp, Brown, and Lewis—in reaching its decision.[6] By indicating in writing its reliance on this documentary evidence, the board's written statement was "sufficient to inform [Brown] of the evidence relied upon by the factfinders in reaching their decision to take disciplinary action." *Jensen,* 688 F.2d at 78.

In so holding, we reject Brown's contention that the *Wolff* written statement requirement can never be satisfied when the written statement refers to certain reports

---

**5.** Moreover, "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators" when an inmate attacks *the methods* a disciplinary board uses to satisfy the written statement requirement. *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979–80. While the written statement requirement is a constitutional right peculiar to the individual being disciplined, it is ultimately an internal prison device with penological benefits. The written statement requirement promotes thought by disciplinary board members, forcing them to weigh evidence and reach reasoned decisions. It promotes consistent and fair board action. This fosters rehabilitation and leads to a less hostile relationship between inmates and prison officials. When inmates are disciplined only after being apprised of the evidence and reasons that led to the disciplinary action, the rehabilitative goals of the institution and the quest for a peaceful prison atmosphere are advanced by negatively reinforcing, in a non-arbitrary fashion, acceptable inmate behavior.

**6.** In its findings of fact, the district court concluded:

> In addition to the conduct violation report and the joint memorandum of Officers Kemp, Lewis and Brown, the adjustment board also reviewed the "additional report" of defendant Kennedy, Captain Hix, Captain Lee Davis and Lieutenant Wilson.

*Brown v. Frey,* slip op. at 7.

This finding, while confusing at best, does support the conclusion that the adjustment board indicated in its written statement that it relied on the conduct violation report and the joint memorandum written by Officers Kemp, Brown, and Lewis in reaching its decision. The district court's further finding that the adjustment board reviewed the reports of "defendant Kennedy, Captain Hix, Captain Lee Davis and Lieutenant Wilson" seems erroneous in that we cannot see how the reference to the single "additional report"—the joint memorandum—could also incorporate four other reports. Moreover, these four other reports make no statements implicating Brown. This further finding is of no consequence, however, because it only purports to add evidence, albeit inconsequential evidence, to an already constitutionally sufficient written statement.

but fails to expressly indicate what statements in those reports the disciplinary board relied on in reaching its decision. Brown premises this contention on *Hayes v. Walker*, 555 F.2d 625 (7th Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977), *Chavis v. Rowe*, 643 F.2d 1281 (7th Cir.), *cert. denied*, 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981), and *King v. Wells*, 760 F.2d 89 (6th Cir. 1985). In *Hayes* the Seventh Circuit held inadequate an adjustment committee's written statement that provided: "The Committee's decision is based on the violation report as written and upon the report by the special investigator which during your absence was made part of the record." *Hayes*, 555 F.2d at 631. The court held this statement inadequate because:

> Rather than pointing out the essential facts upon which inferences were based, the Committee merely incorporated the violation report and the special investigator's report. This general finding does not ensure that prison officials will act fairly. Nor will this finding protect against subsequent collateral effects based on misunderstanding of the initial decision.

*Id.* at 633; *see also Chavis*, 643 F.2d at 1286–87 (the written statement must disclose why the disciplinary board relied on certain evidence and rejected other evidence); *King*, 760 F.2d at 93–94 (each item of evidence must be included in the written statement unless safety concerns dictate otherwise).

We decline to adopt the reasoning of the Sixth and Seventh Circuits. The *Wolff* written statement requirement creates only a minimal standard of procedural conduct needed to satisfy due process; it does not require a "technical and detailed" reconstruction of the incident, as the disciplinary board viewed it, to justify the disciplinary action. *Wilson*, 636 F.2d at 1168. The written statement at issue, while certainly not a model, both survives a literal reading of the requirement and serves the purposes for which the requirement was established.

*Wolff* requires, in part, that the written statement contain the *"evidence* relied on." 418 U.S. at 564, 94 S.Ct. at 2979 (emphasis added). The reports referenced in the adjustment board's written statement undoubtedly qualify as "evidence"—documentary evidence relied on by the board in concluding that Brown committed "riot." Both reports—the conduct violation report and the joint memorandum—are extremely short in length, and an examination of the reports makes it immediately apparent what statements in them were relied on by the board in reaching its decision. The text of the conduct violation reports consists of a single paragraph, the entirety of which implicates Brown. *See supra* note 3. It states, in part, that Brown "incited other residents to join the protest and refused [sic] to return to their rooms when ordered to do so." The joint memorandum consists of three handwritten pages, two paragraphs of which implicate Brown. *See supra* note 2. For example, the joint memorandum states that "William Brown [and five other residents] told the other residents that 'the motherfuckers are wrong so let's don't go nowhere until we see the shift commander.[']" Each statement in these reports that implicates Brown is unambiguous. Moreover, no statement in either report is contradictory to the conclusion that Brown committed "riot." Under these circumstances we cannot conclude that a reiteration of the statements in these reports was necessary to satisfy due process.

There may be situations, however, when the procedural due process balancing test would dictate that a disciplinary board refer to specific statements in a report rather than simply incorporating the entire report by reference. For example, a certain report may be so lengthy that a reference to the entire report does not satisfy due process, or the report may contain contradictory or ambiguous statements, making it difficult to ascertain with certainty what statements in the report the board relied on in reaching its decision. While the due process clause may not require it, we suggest that in the future disciplinary boards

always exercise an abundance of caution and refer to specific statements in reports, or, at the very least, attach to the written statement those reports specifically referenced in the written statement.

In addition to meeting the literal test of the *Wolff* written statement requirement, the adjustment board's written statement adequately serves the purposes for which the requirement was established. First, the written statement assures that the adjustment board did not act arbitrarily; the board based its decision on the statements in the referenced reports that implicate Brown. Second, the written statement guarantees that a reviewing body can fairly and accurately assess any claims made by Brown as to the nature of the incident or the propriety of the proceeding. As the Supreme Court implied in *Hill, supra,* a reviewing body need not limit its review to the information provided on the face of a disciplinary board's written statement. *Id.,* 105 S.Ct. at 2773–75 (instead of limiting its review to the face of the written statement, the Court looks to the entire record). The purpose of a written statement is not to reconstruct in a technical and detailed fashion the incident, as the board concluded it happened, that led to the disciplinary action. Instead, the purpose of the written statement is to require that the disciplinary board make reference to the evidence it relied on and the reasons for the disciplinary action. This forces the disciplinary board to commit itself, contemporaneously with its decision, to certain evidence and reasons, and thus guarantees that the inmate is not placed at a "severe disadvantage" by being forced to explain the incident or seek redress from unconstitutional acts based on a board's explanation that is patched together after the inmate has forwarded his claim. *Wolff,* 418 U.S. at 565, 94 S.Ct. at 2979. In this respect, the distinction between a written statement that incorporates statements in a report by reference and one that repeats statements from the report is inconsequential. In both cases, the board has committed itself to certain evidence, and a review based on established facts is available.

## II.

We next consider whether the adjustment board's decision is supported by "some evidence in the record," as is required by *Superintendent v. Hill,* 105 S.Ct. at 2773. In *Hill,* the Supreme Court characterized the "some evidence" standard as follows:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

*Id.* at 2774.

There is some evidence in the record to support the adjustment board's finding that Brown committed "riot." For example, the joint memorandum prepared by Officers Kemp, Brown, and Lewis identifies Brown as one of the persons that encouraged the inmates to remain in the hall. *Hill* dictates that our inquiry should stop here. We need not examine the entire record, assess the credibility of witnesses, or weigh the evidence; this joint memorandum by itself could support the conclusion reached by the adjustment board.

The dissent, in positing that Brown's participation in a "chorus" establishes guilt by association, contravenes *Hill* in two respects. First, it discredits a single statement in the joint memorandum even though the "some evidence" inquiry could be satisfied by looking to other items of evidence. *See supra* notes 2, 3. Second, in interpreting the joint memorandum, it fails to recognize that the "relevant question is whether there is any evidence in the record that *could support* the conclusion reached by the disciplinary board." *Hill,* 105 S.Ct. at 2774 (emphasis added).

The court appreciates the vigorous representation provided by Brown's court-appointed counsel in this appeal.

The judgment of the district court is affirmed.

BRIGHT, Senior Circuit Judge, dissenting.

Guilt by association may have been the law of Hammurabi[1], but I do not believe that law should be applied in this country, even in a prison setting.

The crucial fact gleaned out of the lengthy majority opinion can be found at p. 1409, n. 2 (quoting from the joint memorandum):

> Officer Brown then told the residents that they were not going to see the shift commander, and to return to their rooms. This was done twice by [Officer] Brown and twice by Kemp. Resident Adcox then began to tell the other residents "Fuck them, we're not going anywhere until we see the shift commander.["] Residents Nathan Williams, William Brown, Adcox, James Gannaway, Robert Wheeler, and Harold Kelly told the other residents that "the motherfuckers are wrong so let's don't go nowhere until we see the shift commander.["] Other residents then began to yell and rally around the other residents.

According to the determination of the prison authorities, five people must be guilty of participating in a riot, including Brown. It becomes self-evident, however, that all five persons had not rehearsed as a chorus so as to speak in unison the words "the motherfuckers are wrong so let's don't go nowhere until we see the shift commander." Thus, the conclusion seems to follow that prisoner Brown's guilt rests upon guilt by association.

Perhaps the majority views the evidence as indicating that a twenty percent chance (one of five) existed that Brown, rather than one of the other prisoners, made the statement. Those odds, however, simply do not establish the truth of the fact asserted. After all, an eighty percent chance existed that someone else made the statement related in the officers' joint memorandum.

For all of that, prisoner Brown loses his good time credits; will serve substantial additional jail time because of revocation of his presumptive parole date; has spent time in solitary, or almost solitary, confinement (segregation); and has suffered a transfer to the Missouri State Prison from Missouri's Eastern Correctional Center. Prisoner Brown is guilty because the prison authorities have said so, not because of evidence.

Some process was due prisoner Brown. He received a hearing that amounted to a facade. No reasoned decision convicting

---

1. The Code of Hammurabi "made the guilt of the individual the guilt of his family as well, so that if a man struck the pregnant daughter of a free man, and she died, 'his daughter shall be slain.'" *People v. Sobczak,* 344 Mich. 465, 73 N.W.2d 921, 923 (1955) (citing The Hammurabi Code and the Sinaitic Legislation, Edwards, p. 63; C.H. § 210; Diamond, Primitive Law, p. 284; 17 University of Chicago Law Review 148).

   In the *Sobczak* opinion, three Michigan justices merely concurred in the result. Judge Talbot Smith, the author of *Sobczak,* explained this somewhat unusual joining in the opinion by a vignette contained in a letter to me about the case, dated December 22, 1975, which I quote in part:

   > You will notice, at the bottom, that three of the Justices wouldn't sign it, merely "concurring in the result." You will notice also that the opinion contains a reference to the Code of Hammurabi. At Conference one of the Justices questioned me about this.
   > "Who is that there rabbi you're citing?"

   > "Oh," I replied, "he wasn't a real rabbi. He was a great Assyrian law giver. That was his name—Hammurabi."
   > My questioner pondered this for a moment. Then he struck the table.
   > "Well, if he's not a real rabbi, why are you citing him?"
   > So, he wouldn't sign the opinion! Nor would [the other two]. All merely concurred in the result. Hammurabi, an Assyrian yet, indeed!

   Judge Talbot Smith served with distinction on the Michigan Supreme Court, 1955–61. He then received an appointment as a United States District Judge for the Eastern District of Michigan in which position he ably served until assuming senior status in 1971. Subsequently, and until his death in late 1978, Judge Talbot Smith returned to appellate judging, sitting with several federal courts, but most frequently with the Eighth Circuit where he participated in more than 450 cases and authored many highly important opinions.

Brown of rioting could rest on the evidence presented to the adjustment board at the prison. Thus, the prison proceedings, in my analysis, lacked due process.

I therefore dissent and would reverse the judgment.