Keith **BROWN–EL**, Appellant,

v.

Paul K. **DELO**, Donald Roper, Larry Scott, James Stubblefield, Linda Wilkson, Del Casly, Thelma Branson, M.M. Guerin, Jerry Pulliam, Ron Beauchamp, Anthony Parker, Appellees.

No. 91–1394.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1992.

Decided July 10, 1992.

Rehearing and Rehearing En Banc Denied Aug. 18, 1992.

Joseph C. Blanton, Jr., Sikeston, Mo., argued, for appellant.

Tamara M. Medler, St. Louis, Mo., argued, for appellees.

Before BEAM, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

Keith Brown–El challenges a district court order granting summary judgment to defendant prison officials in a 42 U.S.C. § 1983 action. We affirm in part, and reverse and remand in part.

In May and June 1989, while Brown–El was confined in the *general population* at

the Missouri State Penitentiary (MSP), now the Jefferson City Correctional Center, he received three conduct violations: two for staying in bed during the 6:00 a.m. count and one for staying in the shower too long. At the disciplinary hearings, Brown–El was found guilty of two Rule 18 violations (interfering with prison count) and one Rule 20 violation (disobeying an order). For the Rule 20 violation, he received as his sentence a two-month limit on his canteen purchases, and for the first Rule 18 violation, he received ten days in disciplinary segregation suspended for thirty days. Brown–El's suspended sentence was revoked for committing the second Rule 18 violation and he was sentenced to ten days detention in disciplinary segregation on a space available basis.[1]

On August 10, 1989, for an unexplained reason and without notice or hearing, Brown–El was removed from the general population and placed in the maximum security unit. Four days later, on August 14, 1989, he was transferred to the Potosi Correctional Center (PCC) and was placed in the administrative segregation unit. On August 16, 1989, Brown–El was given a classification hearing and was assigned to Phase I of administrative segregation, the most severe form of segregation, with his placement to be reviewed in thirty days. The only reasons listed on the classification hearing report for his assignment were the three violations Brown–El committed at MSP.[2]

On August 17, 1989, while in administrative segregation, Brown–El received two conduct violations for participating in an organized disobedience by refusing to give up his food tray when ordered to do so, and for making threats. He was charged with violating Rules 9 and 12 (organized disobedience and making threats). On the same day, a Temporary Administrative Segregation Confinement (TASC) form was prepared, listing Brown–El as an immediate security risk based on his two conduct violations at PCC. He was placed in the TASC unit of the prison. On August 18, 1989, the classification committee again reviewed Brown–El's confinement and determined he should remain in TASC until his disciplinary hearings. In addition to the Rule 9 violation committed at PCC, the classification report also listed the three minor conduct violations Brown–El received at MSP.

On August 23, 1989, Brown–El received two disciplinary hearings for the conduct violations committed at PCC. He did not make a statement at either hearing, but offered written statements. The committee found Brown–El guilty of violations of Rule 19 (creating a disturbance), reduced from the Rule 9 organized disobedience charge, and of Rule 12 (making threats) on the basis of the officers' reports. The committee gave Brown–El a ten-day suspended sentence on the Rule 19 violation and ten days of disciplinary detention in the adjustment unit for making threats, but did not give him credit for time served in TASC.

Brown–El subsequently filed his section 1983 complaint claiming that his placement in administrative segregation upon his arrival at PCC was improper and denied him due process. He also challenged the factual basis for the two conduct violations he received at PCC, which he alleged stemmed from his complaints about not being provided with writing materials. He also complained about the cold food he received while in disciplinary detention, claiming the food caused cramps, nausea and constipation. Finally, Brown–El claimed the restrictions on the use of inmate-to-staff paper, when no other paper was provided, obstructed his use of the mail and denied him access to the courts. Brown–El sought release to the general population,

---

1. The record does not reveal whether Brown–El has served this disciplinary sentence.

2. Prison officials asserted at oral argument that Brown–El was not placed initially in administrative segregation at PCC to serve his disciplinary detention from MSP. If in fact Brown–El had not served the ten-day detention in disciplinary segregation at MSP before August 10, 1989, then there would be no violation of his rights in having him serve the four days in the maximum security unit at MSP and an additional six days in disciplinary segregation at PCC. But this does not appear to be the rationale for the prison officials' actions.

expunction of the conduct violations, and damages against various prison officials.

After the prison officials moved to dismiss the complaint and supplied the various hearing forms and evidence, the district court granted the motion, construing it as a motion for summary judgment. The court concluded that Brown–El was afforded all the process he was due for the conduct violations he received at PCC, that his food and mail claims were without merit, and that his transfer from MSP to PCC did not state a claim.

The court then vacated its order in light of Brown–El's contention that he did not receive the motion to dismiss. Brown–El also argued that he was not challenging his transfer to PCC, but rather his placement into administrative segregation at PCC on August 14. He reiterated his other claims. The prison officials responded that Brown–El's placement into administrative segregation by the classification committee was justified by their assessment that Brown–El was a security risk because of his prior conduct violations and threats against the staff. They asserted that Brown–El received his seventy-two hour hearing in accordance with Mo.Rev.Stat. § 217.375.2 (1989) (current version at Mo.Rev.Stat. § 217.375.1 (Supp.1991)).[3]

The district court again granted summary judgment to prison officials. The court concluded that Brown–El's placement in administrative segregation was a classification matter and that prison management decisions were entitled to deference by the court; that there was "some evidence" to support the disciplinary decisions; that Brown–El's placement in administrative segregation—presumably after August 17—was justified by his conduct violations committed at PCC and not for his past misconduct; that the regulation prohibiting use of inmate-to-staff stationery

for personal letters was not unconstitutional and, in any event, Brown–El had not presented evidence that he otherwise was denied paper; and that Brown–El's claim regarding cold food was frivolous. On appeal, the parties reiterate their arguments presented to the district court.

■ When "an inmate is deprived of privileges or placed in a special confinement status in order to punish him for past misconduct, then due process requires some kind of hearing beforehand." *Jones v. Mabry,* 723 F.2d 590, 594 (8th Cir.1983), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). These due process requirements, set forth in *Wolff v. McDonnell,* 418 U.S. 539, 564–70, 94 S.Ct. 2963, 2978–81, 41 L.Ed.2d 935 (1974), include (1) written notice of the charges, at least twenty-four hours before the hearing, in order to inform the inmate of the charges and to allow him to prepare a defense; (2) a written statement by the fact finders as to the evidence relied on and the reasons for the disciplinary action; (3) the right of the inmate to be present, to call witnesses, and to present documentary evidence, unless to do so would be unduly hazardous to institutional safety or correctional goals; and (4) in limited situations, a counsel substitute. In addition, due process requires that there be "some evidence" supporting the disciplinary determination. *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985).

■ We do not quarrel with the prison's need to segregate individual inmates from the general prison population for nonpunitive reasons; for example, where the inmate is held pending an investigation of misconduct charges or where there is a threat to the safety and security of the institution. *See Hewitt v. Helms,* 459 U.S. 460, 474–76, 103 S.Ct. 864, 872–73, 74

---

**3.** The 1989 version of the statute provided:

When it is determined by the chief administrative officer of an institution that an inmate is an immediate security risk, ... is violent, struggling and creating sufficient disturbance to indicate he is not in control of himself, or

... physically violent, or ... in urgent need to be separated from others for his own safety or that of others, the chief administrative officer ... may transfer the inmate to an administrative segregation unit.... A hearing shall be

L.Ed.2d 675 (1983).[4]

Absent a showing of an expressed intent to punish by the prison officials, whether an inmate is segregated for "punitive" reasons or for administrative purposes generally will turn on whether the detention is reasonably related to a legitimate government objective. *Jones,* 723 F.2d at 594 (citing *Bell v. Wolfish,* 441 U.S. 520, 538–39, 99 S.Ct. 1861, 1873–74, 60 L.Ed.2d 447 (1979)). If the decision to segregate is arbitrary or purposeless, a court may "infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon [inmates]." *Id.*

▇ The prison officials here argue that Brown–El's initial placement into administrative segregation at PCC was not punitive; rather, it was based on their assessment that Brown–El was an "immediate security risk" as contemplated in section 217.375.2 because he committed rule violations at MSP two months earlier. The record, however, belies this argument. According to the record before us, Brown–El was in the general population at MSP after he committed the three violations there. The record contains no justification for his placement in the maximum security unit at MSP two months after he committed the conduct violations.[5] Absent a record that he was placed in segregation for constitutionally appropriate reasons, we can only assume, based on the record before us, that Brown–El was placed in segregation for punitive reasons.

Accordingly, we reverse the district court's grant of summary judgment on this claim, and remand for an evidentiary hearing to determine whether the prison officials at PCC had a punitive intent when they initially placed Brown–El in administrative segregation on August 14, and, if

they did, whether they deprived him of due process when he was placed there without a prior *Wolff* hearing.

▇ On August 17, 1989, after Brown–El was charged with two conduct violations at PCC, he was placed in TASC until his disciplinary hearings on August 23. This confinement did not violate Brown–El's due process rights. *See Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873. The record also shows that Brown–El was granted two disciplinary hearings in accordance with *Wolff* on August 23. We have carefully reviewed the record and conclude that there was "some evidence" to support those disciplinary decisions. *See Hill,* 472 U.S. at 454, 105 S.Ct. at 2773 (1985); *Freitas v. Auger,* 837 F.2d 806, 810–11 (8th Cir.1988); *Brown v. Frey,* 807 F.2d 1407, 1414 (8th Cir.1986). Thus, Brown–El's confinement in disciplinary segregation until on or about September 2, 1989, during which time he was serving his ten-day disciplinary detention for rule violations committed at PCC, did not violate his due process rights.

▇ We agree with the district court that Brown–El's claim that his constitutional rights were violated when he was served cold food is frivolous, *see Rust v. Grammer,* 858 F.2d 411, 414 (8th Cir.1988) (holding that prisoner's diet, limited to cold sandwiches and tap water during nine-day lockdown, did not violate Eighth Amendment), and that the regulation restricting Brown–El's use of staff-to-inmate stationery did not violate his constitutional rights.

▇ In summary, we adhere to the clearly established law of this circuit that a prisoner cannot be punished for a conduct violation without the appropriate notice and hearing requirements set forth in *Wolff.*

---

held concerning the incident within seventy-two hours.

**4.** In 1989, Missouri statutes permitted prison officials to transfer an inmate into administrative segregation if the inmate posed an *immediate* security risk, if there was an *urgent* need to separate the inmate from others for his own safety or for that of others, if the inmate was physically violent, or if the inmate was violent and struggling and was not in control of him-

self. *See* Mo.Rev.Stat. § 217.375.2 (1989) (current version at Mo.Rev.Stat. § 217.375.1 (Supp. 1991)).

**5.** Brown–El wisely does not complain about his transfer to PCC, for there is no "liberty interest" in a prisoner's assignment to a particular institution within the state. *See Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

Prison officials cannot escape the procedural requirements mandated by *Wolff* by defining segregation as "administrative" rather than "punitive." Having said this, we also recognize the right of prison officials to administratively segregate a prisoner when the prisoner is an immediate security risk; is violent, struggling, and creating sufficient disturbance to indicate he is not in control of himself; is physically violent; or is in urgent need to be separated from others for his own safety or that of others. Of course, when an inmate has committed violations repeatedly which endanger the security of the institution and those who live and work there, placing the inmate promptly in administrative segregation after the violations have been committed may be appropriate. When this is done, however, the record must reflect clearly the reasons for this action. In this case, our concern is whether Brown–El's confinement in segregation from August 10, 1989, until August 17, 1989, was punitive or administrative in nature.

Accordingly, we affirm in part, and reverse in part, and remand the case to the district court for further proceedings in accordance with this opinion.