UNITED STATES of America, Appellee,

v.

Anthony Philip JOHNSON, Appellant.

UNITED STATES of America, Appellee,

v.

Chico A. TILLMON, Appellant.

Nos. 94–3822, 94–4039.

United States Court of Appeals,
Eighth Circuit.

Submitted June 13, 1995.

Decided Aug. 28, 1995.

Rehearing Denied Sept. 27, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 11, 1995.*

* Bright, Circuit Judge, would grant the petition for rehearing by the panel.

Virginia G. Villa, Appellate Atty., Office of the Federal Defender, argued, for Anthony Johnson.

Freddrenna M. Lyle, Chicago, IL, argued (Chester Slaughter, on the brief), for Chico Tillmon.

James E. Lackner, Asst. U.S. Atty., argued, for appellee.

Before BEAM, Circuit Judge, BRIGHT, Senior Circuit Judge, and MURPHY, Circuit Judge.

DIANA E. MURPHY, Circuit Judge.

Anthony Johnson and Chico Tillmon were convicted of conspiring to possess cocaine base with the intent to distribute and aiding and abetting its possession. On appeal they argue that the district court[1] erred in denying motions to suppress statements they made after police stopped their vehicle and evidence seized during a search of their motel room. Tillmon raises additional points about the search warrant, and Johnson asserts that the evidence was insufficient to support his convictions. We affirm.

I.

The basic facts related to the stop of the vehicle and the search of the motel room are uncontroverted. On Friday, October 1, 1993, at approximately 10:00 a.m., the St. Paul police department received an anonymous telephone call stating that "a couple of" black males had arrived from Chicago that morning with a kilo of cocaine, that they were driving a black and gold Lexus automobile, and that they were staying either at the Excel Inn or the Ramada Inn east of St. Paul.

Investigating officers found a black and gold Lexus with Illinois plates in the parking lot of the Excel Inn. A check revealed that the car was registered to a woman in Chicago. The officers spoke with the motel desk clerk and learned that the desk had no information about the Lexus, but that Chico Tillmon of Chicago had rented room 222. He had arrived at about 9:20 a.m. that morning, paid cash for the room, and told the desk clerk that another person would be joining him. At the officers' request the clerk called room 222 and verified that the Lexus belonged to the occupant.

Surveillance was instituted on the Lexus, some of which was videotaped. At 1:30 p.m. officers witnessed two black males (later identified as Tillmon and Anthony Johnson) get into the vehicle and drive approximately a half mile. The Lexus went through the parking lot of an apartment building at 292 Ruth Street and continued on to an apartment complex at 1920 Burns Avenue, approximately one mile away. The officers following the Lexus were aware that there had been narcotics investigations and undercover drug buys at both addresses.

Tillmon entered one of the Burns apartment buildings, and then he and Johnson helped an unidentified woman move a stereo speaker to her car. Tillmon and Johnson then went to an apartment on York Avenue where they spent about 15 minutes unloading and moving the speaker.

Tillmon and Johnson then returned to the Burns apartment. Tillmon was driving at a speed significantly slower than other traffic, changed lanes several times without signaling, and glanced around frequently. Sergeant Neal Nelson, a narcotics officer who followed the Lexus in an unmarked vehicle,

---

1. The Honorable David S. Doty, United States District Judge for the District of Minnesota.

testified at the motion hearing that Tillmon drove as if he were trying to determine if the car were being followed.

When the Lexus arrived at the Burns apartments, it pulled into the parking lot, drove immediately out, and returned to the Ruth apartments. It entered the Ruth parking lot, but when an unmarked police surveillance vehicle followed it into the lot, the Lexus turned around and began to leave. It then met another car and backed into the lot. Tillmon and Johnson talked with two young men from the other car for about an hour. All four then got into the Lexus and went to a check cashing business where they remained for about 20 minutes.

At this point Sergeant Nelson decided to stop the Lexus, and he called for a uniformed squad car to meet him at a nearby restaurant. Officer Ronald Sherbert responded. Nelson briefed Sherbert and asked him to make an investigative stop of the vehicle. Sherbert was to ask the driver where he was from, what he was doing in St. Paul, and where he was staying; he was to contact Nelson if the driver did not mention the Excel Inn.

At about 5:10 p.m. the Lexus drove away from the check cashing business and onto Johnson Parkway, where Sherbert observed it roll through a stop sign. Sherbert stopped the Lexus. He testified at the suppression hearing that he had observed a traffic violation but would have stopped it anyway because of Nelson's instructions.

Tillmon did not have a driver's license, so Sherbert placed him in the back seat of the squad car, consistent with regular procedure. Tillmon was not handcuffed or told that he was under arrest or about his *Miranda* rights. Sherbert asked Tillmon his name, and Tillmon identified himself as Javon Cheek. Sherbert ran an administrative check for a driver's license under that name and discovered Javon Cheek had a valid license. Sherbert asked Tillmon the questions Nelson had requested, and Tillmon responded that he was from Chicago, that he had driven up with his aunt and another man,

and that he was staying with a cousin. He did not mention that he had a room at the Excel Inn.

Sherbert contacted Nelson, who proceeded to the scene of the traffic stop, along with other officers. Nelson arrived within five minutes of the initial stop, and entered the rear of the squad car to talk to Tillmon. He was not in uniform, and he left the door open. Nelson spoke with Tillmon for approximately ten minutes. He asked Tillmon if he were aware that he was not under arrest, and Tillmon replied affirmatively. In response to Nelson's questions Tillmon repeated that he had come from Chicago with his aunt and one of the men on the sidewalk, and that they had arrived at 11 a.m. He added that they had dropped his aunt off and driven around to visit friends. When asked about a pager he was wearing, Tillmon stated that he had rented it at the check cashing store so that the mother of his newborn twins could reach him.

Tillmon was calm until Nelson asked if he had been at the Excel Inn; he then began to sweat and stammer and denied knowing of the motel or having been there. Nelson told Tillmon that surveillance officers had seen him at the motel, and Tillmon responded that he might have stopped there that morning with his aunt. Nelson asked if there were drugs in the car, and received Tillmon's permission to search it and him. No drugs were found.

While Sherbert and Nelson spoke with Tillmon, Johnson and the other two passengers [2] stood on the curb near the Lexus. An officer stood by them, but they were not in handcuffs or told they were under arrest. When Nelson finished talking to Tillmon, he approached Johnson and asked if they could talk in another squad car. Johnson agreed and indicated that he understood that he was not under arrest. Johnson told Nelson that his name was Kermit Davis and that he, the driver, and the driver's brother had driven from Chicago the previous night. In response to questions he stated that the driv-

---

2. An officer at the scene testified at the hearing that he had recognized the other two passengers from a recent drug investigation.

er's aunt had not travelled with them, and he denied any knowledge of the Excel Inn. Johnson then asked if he were free to leave, and Nelson replied that he was not. Nelson's interview with Johnson lasted approximately five minutes.

After talking with Tillmon and Johnson, Nelson believed that he had probable cause to obtain a search warrant for the motel room. Nelson told the other passengers that they were free to go, but that Tillmon and Johnson were being detained because the car was listed as stolen. Tillmon and Johnson were told they were being detained for investigative purposes and would be taken to the Excel Inn.

While Nelson filled out an application for a warrant, four officers went to the motel, transporting Tillmon and Johnson in separate squad cars. The officers knocked on the door of room 222 and identified themselves. Javon Cheek, Tillmon's half brother, opened the door. The officers secured the room and conducted a protective sweep for weapons, but waited until a search warrant was issued before conducting a search. While they were waiting, they asked Cheek about a pager which was visible in the room, and he responded that it belonged to Kermit Davis (Johnson).

After Nelson telephoned the motel room to inform the officers there that the warrant had been issued, they searched the room. In a side compartment of a black softsided briefcase they found an electronic scale; a pair of boots belonging to Johnson was found in the main compartment. In a paper sack officers found a box of Tide laundry detergent which appeared unopened. Inside were two bags of crack cocaine totaling approximately 265 grams.

Tillmon, Johnson, and Cheek were indicted on two counts of conspiring to possess cocaine base and aiding and abetting its possession in violation of 21 U.S.C. §§ 846 and 841(a)(1). All three moved to suppress the evidence gathered at the motel room and the statements made when the Lexus was stopped. The motions were denied by the district court. After a jury trial Cheek was acquitted, but Johnson and Tillmon were convicted on both counts.

## II.

Johnson and Tillmon contend that the stop of the Lexus, questioning by police, and the search of the motel room were illegal and that resulting evidence should not have been admitted at trial.

Johnson and Tillmon argue that the investigative stop was unlawful because the anonymous tip contained no indicia of reliability and was not sufficiently corroborated by police investigation. A police officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). The officer may ask the detainee questions in order to dispel or confirm his suspicions, but questioning is limited in scope to the circumstances that justified the stop. *United States v. Cummins*, 920 F.2d 498, 501 (8th Cir.1990), *cert. denied*, 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991). Reasonable suspicion is based on the totality of the circumstances, *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981), which are viewed in light of the officer's experience and familiarity with drug trafficking. *United States v. Condelee*, 915 F.2d 1206, 1209 (8th Cir.1990). Even innocent actions may give rise to reasonable suspicion if they warrant consideration under the totality of the circumstances. *Id.*

Whether reasonable suspicion exists to justify a seizure is a mixed question of fact and law. We review the district court's findings of fact for clear error, but the ultimate conclusion as to whether reasonable suspicion exists is reviewed de novo. *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir.1994) (en banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995).

We conclude that under the totality of the circumstances the investigative stop did not violate appellants' Fourth Amendment rights because the officers were aware of facts which gave rise to a reasonable suspi-

cion that Tillmon and Johnson were involved in criminal activity.

Although the tip contained no indication of reliability, its accuracy was established through police investigation. The tipster reported that two black males had brought a kilo of cocaine from Chicago that morning, were driving a black and gold Lexus, and were staying at the Excel Inn or Ramada Inn east of St. Paul. A black and gold Lexus with an Illinois license plate was found in the Excel Inn lot. Investigation revealed that the car was connected to Room 222 and that the person who rented that room was from Chicago, had checked in that morning, paid in cash, and told the motel clerk that another person would be joining him. Officers later saw two black males leave the Excel Inn and drive away in the Lexus. Thus, investigation corroborated the number of men reported by the tipster, their race, where they came from, where they were staying, and the vehicle they were driving.

The tip was further corroborated by appellants' conduct during the surveillance. The Lexus went to two addresses which the officers associated with drugs, and drove in and out of the parking lots of those buildings several times. The driver of the car appeared to be using counter-surveillance tactics. Moreover, officers were aware through their experience that Chicago is a source city for drugs, that drug activity is high on weekends and at the beginning of each month, and that out-of-town dealers often rent motel rooms.

Johnson and Tillmon suggest that the corroboration necessary for an anonymous tip under *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), is predictive in nature. It is true that in *White* corroboration of a tip that a woman carrying drugs would leave an apartment at a certain time and drive to a motel created reasonable suspicion, but the case does not create a rule requiring that a tip predict future action.[3] *See United States v. Cox*, 942 F.2d 1282 (8th Cir.1991), *cert. denied*, 503 U.S. 921, 112

S.Ct. 1298, 117 L.Ed.2d 520 (1992) (holding that police had reasonable suspicion to stop a vehicle based on a corroborated anonymous tip which did not predict the suspect's behavior); *see also United States v. Clipper*, 973 F.2d 944, 949–50 (D.C.Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993).

Tillmon asserts that even if the stop were justified initially, it became an arrest when questioning went beyond the scope of the traffic violation witnessed by officer Sherbert. This argument is without merit. The record reflects that the stop was not based only on the traffic violation, but also on reasonable suspicion arising from the corroborated tip. Questions about the Excel Inn and appellants' reason for being in St. Paul were reasonably related to a legitimate basis for the stop. *See Cummins*, 920 F.2d at 501.

The anonymous tip and its corroboration through investigation and surveillance created a particularized and objective basis for suspecting Johnson and Tillmon of being the men identified by the tipster. Their responses to police questions confirmed the officers' suspicions and reasonably led to more questions. The scope of the questioning did not go beyond what was reasonable under the circumstances.

Appellants argue that the district court should have suppressed the statements they made at the scene of the stop because they were subjected to custodial interrogation without being informed of their rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

A suspect is in custody for purposes of *Miranda* when he is arrested or when he is "deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612. Whether a suspect is in custody is determined by considering whether a reasonable person in his position would have understood the nature of his situation. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138,

---

**3.** Such a rule would be contrary to the line of cases holding that reasonable suspicion must be judged on the totality of the circumstances. *See, e.g., Cortez*, 449 U.S. at 411, 101 S.Ct. at 690, *see also Illinois v. Gates*, 462 U.S. 213, 103 S.Ct.

2317, 76 L.Ed.2d 527 (1983) (rejecting two pronged test requiring a tip to show informant's basis of knowledge and facts sufficient to indicate reliability in favor of totality of the circumstances approach).

3151, 82 L.Ed.2d 317 (1984). The district court's factual findings concerning custody are reviewed for clear error. *United States v. Griffin,* 922 F.2d 1343, 1347–48 (8th Cir. 1990).

■ *Miranda* warnings are not necessary during ordinary *Terry* stops because they generally do not amount to custodial interrogation. *See Berkemer,* 468 U.S. at 439–40, 104 S.Ct. at 3149–50; *United States v. Gale,* 952 F.2d 1412, 1415 n. 4 (D.C.Cir.), *cert. denied,* 503 U.S. 923, 112 S.Ct. 1302, 117 L.Ed.2d 524 (1992); *United States v. McGauley,* 786 F.2d 888, 890 (8th Cir.1986). If an individual's "freedom of action is curtailed to a 'degree associated with formal arrest'", then he is in custody. *Berkemer,* 468 U.S. at 440, 104 S.Ct. at 3150 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)). Factors useful in considering whether custody is involved are whether the suspect was advised that he was free to go, whether he was restrained, whether he initiated contact with authorities, whether strong arm tactics or deceptive stratagems were used, whether the atmosphere was police dominated, and whether the suspect was placed under arrest at the termination of questioning. *U.S. v. Griffin,* 922 F.2d at 1348.

■ Analysis of these factors leads to the conclusion that Tillmon and Johnson were not in custody until they were taken back to the motel. Both were specifically advised after the stop that they were not under arrest. Although their freedom of movement was somewhat restricted because they were questioned in squad cars, they were not handcuffed or otherwise restrained. They were not isolated, and their passengers remained at the scene. Johnson and Tillmon did not initiate the police contact, but both responded to questions, and Johnson affirmatively agreed to enter the squad car and talk with Nelson. No strong arm tactics were employed, and the questioning was straightforward. Although there were a number of officers at the scene, only Sherbert and Nelson questioned appellants, and Nelson was not in uniform. Finally, Tillmon and Johnson were not formally arrested or booked at the scene.

Tillmon asserts that the district court erred in denying the motion to suppress because the affidavit in support of the search warrant lacked sufficient facts to give rise to probable cause and contained deliberate or reckless falsehoods.

Probable cause to issue a search warrant exists when the supporting affidavit sets forth sufficient facts to lead a prudent person to believe that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). We believe that the affidavit submitted by Sergeant Nelson meets this standard.

[11] Nelson's affidavit set forth information about the tip and its corroboration, and reported that both men denied involvement with the Excel Inn, that their stories about travelling from Chicago did not match, and that Tillmon began to sweat and stammer when Nelson told him he had been seen leaving the motel. Nelson stated from experience that out-of-town drug dealers often stay at motels and wear pagers, and noted that Johnson and Tillmon carried no identification. These facts, which further corroborated the tip, established probable cause to believe that drugs and other evidence of illegal activity would be found in the motel room.

■ Even if the facts contained in the affidavit did not give rise to probable cause, the evidence found in the motel room was admissible because Nelson and the officers who executed the search acted in the good faith belief that probable cause existed based on the issuance of the warrant. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Gibson,* 928 F.2d 250, 254 (8th Cir.1991). Given the specific information detailed in the affidavit, it would have been objectively reasonable for them to have relied on the issuing judge's determination that probable cause existed. *See Leon,* 468 U.S. at 922, 104 S.Ct. at 3420.

■ Tillmon asserts that Nelson's affidavit contained statements that were deliberately false or made with deliberate disregard

for the truth and that suppression is the appropriate remedy for his misconduct. *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420; *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). He points out, and the government concedes, that Nelson's affidavit contains errors: it states that both Tillmon and Johnson entered the Burns apartment and that the tip was received at noon. The surveillance videotape reveals that only Tillmon went into the apartment, and police records indicate the tip was received at about 10 a.m.

The fact that the affidavit contained minor errors is not in itself sufficient to warrant suppression. *See Franks,* 438 U.S. at 164–65, 98 S.Ct. at 2680–81. Instead, the proper inquiry is whether the errors reflect deliberate falsehoods or reckless disregard for the truth. The discrepancies Tillmon notes, without more, are insufficient to demonstrate deliberate or reckless falsehood; at best, they show negligence. Moreover, even if Tillmon had made a proper showing, suppression would not be warranted because the unchallenged portions of the affidavit establish probable cause. *Id.*

 Tillmon also alleges for the first time on appeal that the surveillance videotape was deliberately withheld from the judge who issued the warrant and later from defense counsel. We will not normally consider an issue first raised by a party on appeal, *United States v. Oransky,* 908 F.2d 307, 309 (8th Cir.1990). Even if we were to consider the issue, Tillmon cites no case law to support the proposition that Nelson was required to show the issuing judge the surveillance videotape, nor has he explained why the tape, which primarily shows moving activities, materially adds to the information in the warrant affidavit. We see no reason why it would have been necessary for the issuing judge to view the videotape in order to evaluate the existence of probable cause. The record does not support Tillmon's assertion that the surveillance tape was "hidden" from defense counsel. All three defendants were informed of the existence of the tape during the suppression hearing held more than two months before trial. They were given the opportunity to review it, and any objections could and should have been raised then or at trial.

## III.

 Johnson claims that the evidence presented at trial was insufficient to convict him of conspiring to possess cocaine or aiding and abetting possession. We review claims of insufficient evidence by examining the trial evidence in the light most favorable to the government and accepting as established all reasonable inferences supporting the verdict. *United States v. Madkins,* 994 F.2d 540 (8th Cir.1993). A conviction will be upheld unless no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Quintanilla,* 25 F.3d 694, 699 (8th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 457, 130 L.Ed.2d 365 (1994).

 To convict Johnson of the conspiracy charge the government was required to show that he entered into an agreement to possess crack cocaine for the purposes of distribution. *See United States v. Ivey,* 915 F.2d 380, 384 (8th Cir.1994). Because a conspiracy by its nature entails secrecy, the agreement and the members' participation must often be established by inferences drawn from the circumstances. *Id.* The aiding and abetting count required proof that Johnson affirmatively participated or encouraged the unlawful activity. *See id.*

 Johnson correctly points out that neither presence at the scene of unlawful activity or association with those engaged in the activity, without more, is sufficient to establish participation in a conspiracy or aiding and abetting. The evidence presented by the government did more than show that Johnson was present or that he associated with individuals engaged in criminal activity, however. Taken in the light most favorable to the government, it established that Johnson was a knowing participant in a conspiracy to possess crack cocaine for purposes of distribution, and that he affirmatively assisted in the scheme.

Johnson and Tillmon travelled together from Chicago, and both stayed in the room where the drugs were found. Neither man carried identification, a wallet or credit cards. Johnson had only $52 dollars with him; Tillmon had $111, and had paid cash for the room. When stopped, Johnson gave a false name and lied about the Excel Inn, and Javon Cheek told police that a pager in the motel room belonged to Johnson. An electronic scale was found in the softsided briefcase with Johnson's boots, along with some personal items Johnson's girlfriend had given him to take along on the trip. Johnson claims that no evidence suggests he was aware the scale was in the briefcase, but the fact that his boots and other personal items were found there gives rise to the inference that Johnson was aware of and had constructive possession of the scale. Viewed in the light most favorable to the government the evidence was sufficient to permit the jury to find Johnson guilty of conspiring to possess and aiding and abetting the possession of crack cocaine.

For the reasons stated, the judgments of conviction are affirmed.

BRIGHT, Senior Circuit Judge, dissenting.

I respectfully dissent from the majority's opinion which affirms the conviction of Anthony Johnson. The circumstantial evidence is too slight to prove beyond a reasonable doubt that Johnson was knowingly associated with the drugs seized from the co-defendant Chico Tillmon.

In this case, the crucial issue is whether the government's evidence is sufficient to support the conviction of Johnson of the charge of conspiring to possess cocaine or aiding and abetting possession. Here, the government has failed to meet its burden of proof, and no reasonable jury could have found Johnson guilty beyond a reasonable doubt.

A review of the record reveals the following:

(1) Johnson traveled as a passenger in the Lexus;

(2) Johnson stayed in the same hotel room where drugs were found concealed in a laundry detergent box;

(3) Neither Johnson nor Tillmon carried identification;

(4) Johnson possessed only $52.00 in cash;

(5) Johnson told officer Nelson that his name was Kermit Davis (a close friend who possessed a valid driver's license);

(6) Johnson denied any knowledge of the Excel Inn; and

(7) An electronic scale and pair of Johnson's boots were stored in the same softsided briefcase which Johnson asserts he did not pack.

All of this circumstantial evidence corresponds with the activities of an innocent person.

As I see it under the evidence, Johnson, a twenty-five year old African American, with no prior criminal history, must serve a prison term of more than twelve years (151 months) based on a case resting on his association with the driver of the Lexus, Chico Tillmon. As we have observed, the police found crack cocaine in a Tide detergent box in a paper sack located in the hotel room occupied by Johnson, Tillmon and a third defendant, Javon Cheek, who was acquitted. The detergent box in the paper sack also held clothing and other articles, not associated with Johnson.

The government does not argue that it showed any direct connection between Johnson and the crack-cocaine. The government's case essentially rests on the circumstances that Johnson's boots and the electronic scale were in the same baggage container (not the paper sack); that Tillmon and Johnson carried no identification and possessed about $160 cash ($52 on Johnson) and that Johnson did not give his correct name or acknowledge staying at the Excel Inn. Therefore, the government argues that Johnson must have been a participant with Tillmon in proposed drug sales.

Because the government found the "goods" on Chico Tillmon does not, except by association, put those "goods" on Johnson.

As I have said before, and I say it again, guilt by association was the Code of Hammurabi, but is not the law of this land. I quote from *Brown v. Frey*, 807 F.2d 1407, 1415 (8th Cir.1986):

> Guilt by association may have been the law of Hammurabi[1] but I do not believe that law should be applied in this country, even in a prison setting.
>
> _____
>
> [1] The Code of Hammurabi "made the guilt of the individual the guilt of his family as well, so that if a man struck the pregnant daughter of a free man, and she died, 'his daughter shall be slain.'" *People v. Sobczak*, 344 Mich. 465, 73 N.W.2d 921, 923 (1955) (citing The Hammurabi Code and the Sinaitic Legislation, Edwards, p. 63; C.H. § 210; Diamond, Primitive Law, p. 284; 17 University of Chicago Law Review 148).

*Brown v. Frey*, 807 F.2d 1407, 1415 & n. 1 (8th Cir.1986) (Bright, J., dissenting).

The guilt in this case is only that of association. That sort of case does not support a conviction here.[1]

In a case of questionable guilt, Johnson must serve a very heavy sentence. Under the mandatory sentence provisions and the guidelines, Anthony Johnson, who has no prior convictions, will serve a term of incarceration of more than twelve years because he was found guilty of distribution of crack cocaine. Sentences in drug cases are in large part measured by the weight of drugs, and not necessarily the bad acts of the defendant. Crack cocaine carries weight for sentencing which is 100 times greater than that of powdered cocaine, a drug substance quite similar to crack cocaine. Johnson is presently the age of twenty-six years and when he is released from the penitentiary he will be approximately thirty-eight years old. If Johnson had been convicted of a cocaine violation his guideline sentence would have amounted to less than three and one-half years. It seems to me that the extra incarceration in this case is unnecessary and will be at a substantial cost to society. If we would assume a five year sentence would be a proper sentence in this case, the cost to the public of the extra incarceration is approximately $154,000. *See United States v. Hiveley*, 61 F.3d 1358, 1364 (8th Cir.1995) (Bright, J., concurring). Mandatory minimum and concomitant guideline sentence requirements can produce unreasonable sentences in drug cases. I commented on sentences of this sort in a recent concurring opinion:

> These unwise sentencing policies which put men and women in prison for years, not only ruin lives of prisoners and often their family members, but also drain the American taxpayers of funds which can be measured in billions of dollars. In these times, the government, Congress and the President see the need to make drastic cuts in the federal budget, including budget cuts which already affect the poor, the disadvantaged and the elderly. This is the time to call a halt to the unnecessary and expensive cost of putting people in prison for a long time based on the mistaken notion that such an effort will win "The War on Drugs." If it is a war, society seems not to be winning, but losing. We must turn to other methods of deterring drug distribution and use.

*Id.* at 1363.

_____

1. *Brown v. Frey* and its discussion of the Code of Hammurabi emanates from the opinion in *People v. Sobczak* of the late Judge Talbot Smith for the Michigan Supreme Court. Judge Talbot Smith later served as a federal judge and frequently sat with the Eighth Circuit. I am indebted to Judge Talbot Smith for the material and vignette contained in note 1 of *Brown v. Frey*, 807 F.2d at 1415.