**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 96-3542EM, 96-3584EM, 96-3732EM, 97-2196EM

_____

|  |  |
|---|---|
| _____ | * |
|  | * |
| No. 96-3542EM | * |
| _____ | * |
|  | * |
| United States of America, | * |
|  | * |
| Appellee, | * |
|  | * |
| v. | * |
|  | * |
| William Fred Coleman, Jr., also known | * |
| as William Coleman, | *  On Appeal from the United |
|  | *  States District Court |
| Appellant. | *  for the Eastern District |
|  | *  of Missouri. |
| _____ | * |
|  | * |
| No. 96-3584EM | * |
| _____ | * |
|  | * |
| United States of America, | * |
|  | * |
| Appellee, | * |
|  | * |
| v. | * |
|  | * |
| Mark D. Ward, | * |
|  | * |
| Appellant. | * |

```
              _____        *
                                   *
         No. 96-3732EM             *
              _____        *
                                   *
United States of America,          *
                                   *
         Appellee,                 *
                                   *
    v.                             *
                                   *  On Appeal from the United
Tom Leroy Whitehurst,              *  States District Court
                                   *  for the Eastern District
         Appellant.               *  of Missouri.
                                   *
              _____        *
                                   *
         No. 97-2196EM             *
              _____        *
                                   *
United States of America,          *
                                   *
         Appellee,                 *
                                   *
    v.                             *
                                   *
Stacey Anne Gessaman,              *
                                   *
         Appellant.                *
```

**O R D E R**

On the court's own motion, the panel opinion is amended. The clerk is directed to

file the panel's amended opinion and attach a copy of it to the order.

May 20, 1998

Order entered at the direction of the Court:

Clerk, U.S. Court of Appeals, Eighth Circuit

-3-

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

### Nos. 96-3542EM, 96-3584EM, 96-3732EM, 97-2196EM

_____

_____                          *
                                       *
No. 96-3542EM                          *
                                       *
_____                          *
                                       *
United States of America,              *
                                       *
      Appellee,                         *
                                       *
v.                                     *
                                       *
William Fred Coleman, Jr., also known  *
as William Coleman,                    *   On Appeal from the United
                                       *   States District Court
      Appellant.                        *   for the Eastern District
                                       *   of Missouri.
_____                          *
                                       *
No. 96-3584EM                          *
                                       *
_____                          *
                                       *
United States of America,              *
                                       *
      Appellee,                         *
                                       *
v.                                     *
                                       *
Mark D. Ward,                          *
                                       *
      Appellant.                        *

_____

No. 96-3732EM

_____

United States of America,

      Appellee,

v.

Tom Leroy Whitehurst,

      Appellant.

_____

No. 97-2196EM

_____

United States of America,

      Appellee,

v.

Stacey Anne Gessaman,

      Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\* On Appeal from the United
\* States District Court
\* for the Eastern District
\* of Missouri.
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
_____

Submitted:  November 17, 1997

Filed:  March 5, 1998

Amended: May 20, 1998

_____

Before RICHARD S. ARNOLD,[1] Chief Judge, McMILLIAN and MAGILL, Circuit
   Judges.

_____

RICHARD S. ARNOLD, Chief Judge.

William Coleman, Stacey Gessaman, Mark Ward, and Thomas Whitehurst
appeal the sentences they received for methamphetamine manufacture and related
crimes. For the most part, we affirm the sentences imposed by the District Court.[2] We
remand Coleman's case for resentencing using his correct Criminal History Category.

## I. Facts

In early 1995, law enforcement officials in Missouri were alerted that William
Austin was purchasing suspiciously large amounts of iodine. Upon detention and a
promise of immunity from prosecution, Austin admitted that he was buying the iodine
for use in the manufacture of methamphetamine. He implicated Coleman, Gessaman,
Ward, and Whitehurst in operating a methamphetamine laboratory at a farmhouse
rented by Whitehurst and Gessaman in Sullivan, Missouri.

After a controlled delivery of iodine by Austin to the farmhouse, FBI agents
obtained a warrant to search the farmhouse. On December 23, 1995, they surrounded
the farmhouse. An FBI negotiator left a message on the answering machine that the

---

[1]The Hon. Richard S. Arnold was Chief Judge of the United States Court of
Appeals for the Eighth Circuit when these appeals were argued and submitted, and
when the opinion was originally filed on March 5, 1998. On April 17, 1998, he
stepped down as Chief Judge. The Hon. Pasco M. Bowman II is now Chief Judge.

[2]The Hon. Carol Jackson, United States District Judge for the Eastern District
of Missouri.

house was surrounded, the warrant would be executed, and the occupants of the house should vacate immediately. A second call was answered by Whitehurst, to whom these directions were repeated. During the conversation, Whitehurst was heard instructing others within the farmhouse to destroy evidence of drug production. After about 12 minutes, Coleman, Ward, and Whitehurst came out of the farmhouse. As they were leaving, smoke started to come out of the area of the farmhouse alleged by Austin to contain the methamphetamine laboratory. Eventually, the whole farmhouse burned down. After the fire, the FBI found weapons, laboratory equipment, and residual amounts of ephedrine, iodine, and red phosphorus, which are methamphetamine ingredients. The appellants were indicted on this evidence and Austin's testimony.

Coleman, Ward, and Whitehurst were convicted of conspiracy to manufacture methamphetamine, 21 U.S.C. § 846 (1994) (Count I); use of fire and explosive material to destroy property used in interstate commerce, 18 U.S.C. § 844(i) (1994) (Count II); and destruction of property to prevent seizure of evidence, 18 U.S.C. § 2232(a) (1994) (Count III). Whitehurst was convicted of three additional counts: possession of firearms by a convicted felon, 18 U.S.C. §§ 922(g), 924(a)(2) (1994) (Counts IV and VI); and possession of ephedrine with the intent to manufacture methamphetamine, 21 U.S.C. § 841(d)(1) (Count V).[3] Gessaman pleaded guilty to conspiracy to manufacture methamphetamine, 21 U.S.C. § 846 (1994).

At sentencing, the District Court found that the conspiracy had produced at least 16.67 kilograms of methamphetamine, which corresponded to a base offense level of 36. For their burning of the farmhouse, Coleman, Ward, and Whitehurst received two-level enhancements for obstruction of justice. Whitehurst received a further four-level enhancement for his leadership role in the conspiracy. The District Court sentenced Coleman to 262 months, Ward to 235 months, and Whitehurst to life. Gessaman

---

[3]This count arose from drugs found during a traffic stop in 1994, discussed below.

received a two-level enhancement for related weapon possession, and a three-level decrease for acceptance of responsibility. She was sentenced to 168 months in prison.

Coleman, Ward, and Whitehurst received additional, concurrent sentences. Each was sentenced to 240 months on Count II and 60 months on Count III. Whitehurst also was sentenced to 120 months for Counts IV-VI of his conviction.

At issue are the District Court's determination of methamphetamine quantity produced by the conspiracy; its attribution of the total amount to each individual defendant; its application of role-in-the-offense and other adjustments to the base offense level; and its determination of Coleman's Criminal History Category. Additionally, Coleman and Ward argue for retrials, because of the ineffective assistance of trial counsel and alleged errors by the District Court, respectively. Finally, Whitehurst and Gessaman object to the use against them of weapons and drugs seized during a traffic stop in 1994, as evidence in Whitehurst's trial and as the basis for an enhancement in Gessaman's sentencing. We address each issue in turn.

## II. Determination of Methamphetamine Quantity Attributable to the Conspiracy

Because the physical evidence of methamphetamine production consisted of preliminary ingredients, the District Court had to approximate the quantity of finished product for which the defendants would be sentenced. U.S.S.G. § 2D1.1, commentary n.12 (1997). Its calculation began with 81.5 pounds of iodine, which Austin had testified to purchasing for the operation. It then applied what Austin had testified to be the defendants' formula for methamphetamine: three parts ephedrine to two parts iodine to one part red phosphorus. The Court then took into account the practicalities of the manufacturing process and made a conservative estimate of ultimate production. The defendants challenge each step of the calculation. We uphold the District Court's determination of methamphetamine quantity.

We review a district court's determination of drug quantity for clear error. United States v. Sales, 25 F.3d 709, 711 (8th Cir. 1994). "Defendants who challenge the sentencing court's determination of drug quantity face an uphill battle on appeal, because we will reverse a determination of drug quantity only if the entire record definitely and firmly convinces us that a mistake has been made." Id. First, the District Court's reliance on Austin's testimony, which provided the beginning amount of iodine as well as the formula used to extrapolate the amount of resultant methamphetamine, was not clear error. Determinations of witness credibility are virtually unreviewable. United States v. Adipietro, 983 F.2d 1468, 1472 (8th Cir. 1993). The District Court considered Austin's lengthy criminal history and serious drug abuse, and its possible effects on his mental acuity, but concluded there was nothing to indicate that, at the time of trial, Austin "suffered any impairment of memory; of cognition; or of perception or reasoning to the extent that his testimony is rendered unreliable." Whitehurst Sentencing Tr. at 103 (October 10, 1996). We note that the District Court did not credit Austin's testimony entirely; 81.5 pounds represented only part of the total iodine Austin testified to purchasing. As to the "3-2-1" formula, the District Court found that Austin's testimony bore "more than a ring of truth"and was supported by "ample information." Id. at 105. We defer to the District Court's evaluation of Austin's credibility.

The District Court's use of iodine quantity to calculate methamphetamine quantity and its computation of yield also were not clear error. The defendants argue that, because iodine is used as a reagent (in excess) rather than as a precursor (in fixed proportion), iodine quantity bears no fixed relationship to resultant methamphetamine quantity. They also urge that the specific capacities of the farmhouse lab allowed only an inefficient yield, less than a 100% theoretical yield. The District Court heard extensive expert testimony on these issues at trial and at sentencing, from two chemists for the government and one for the defense. Further, Austin testified to the particular formula used by the defendants, which specified the relative proportions of chemical ingredients and thus eliminated the alleged indeterminacy. Using this formula and an

iodine amount of 82 kilograms, even a yield assumption of 50 to 55% would have resulted in 60 pounds, or 27 kilograms, of methamphetamine. Whitehurst Sentencing Tr. at 116 (October 9, 1996). The District Court's use of 16.67 kilograms for sentencing was therefore conservative, and not clearly erroneous.

### III. Determination of Methamphetamine Quantity Attributable to Individual Defendants

We reject the assertions that Coleman, Gessaman, and Ward should not be held responsible for the full amount of methamphetamine produced by the conspiracy. Coleman claims that his late entry into the conspiracy -- allegedly in 1994, over a year after the conspiracy was determined to have begun -- should have been reflected in a reduced drug quantity for sentencing. However, in 1995 alone, the conspiracy purchased an estimated 60 pounds of iodine, which, using the District Court's method of calculation, would have yielded 12.27 kilograms of methamphetamine, leaving the base offense level unchanged. U.S.S.G. § 2D1.1 (1995) (Level 36 offense level applies to methamphetamine quantities of 10 to 30 kilograms).[4]

Gessaman and Ward assert that they did not agree to "jointly undertake" the production of the total amount of methamphetamine, nor was that amount "reasonably foreseeable" to them. See U.S.S.G. § 1B1.3(a)(1)(B) (1997). Because Ward did not raise the issue of foreseeability either in objections to his presentencing report or at his sentencing, the District Court properly relied on the presentencing report's findings, which held Ward accountable for the full amount of drugs produced by the conspiracy. See United States v. Montanye, 996 F.2d 190, 192 (8th Cir. 1993), cert. denied, 117

---

[4]Under the November 1, 1997 version of the Guidelines, a Level 36 base offense level applies to methamphetamine quantities ranging from five to fifteen kilograms. U.S.S.G. § 2D1.1 (1997).

S. Ct. 318 (1996). As to Gessaman, the record supports the District Court's findings on foreseeability. Gessaman stipulated that she purchased ingredients and generally

assisted Whitehurst in the operation.  Evidence presented during her codefendants' trial and her sentencing hearing showed that she rented the farmhouse, helped purchase iodine and lab equipment, accepted iodine deliveries, and worked in the laboratory.  In light of this evidence, the District Court properly found that "[s]he was involved in the jointly undertaken criminal activity" and that "she was aware that there was ongoing manufacture of methamphetamine in this case; and therefore, it was reasonably foreseeable to her that the yield would be of the quantity that the Court has determined it to be."  Gessaman Sentencing Tr. at 145-46 (April 9, 1997).

## IV.  Role-in-the-Offense Adjustments

Whitehurst disputes the four-level increase to his offense level, for his leadership role in the conspiracy.  See U.S.S.G. § 3B1.1(a) (1997).  Coleman, Gessaman, and Ward argue that their offense levels should have been decreased, because they were only minimal or minor participants.  See U.S.S.G. § 3B1.2 (1997).  We hold that the District Court's resolution of these issues was correct.

The evidence at trial amply showed Whitehurst's direction of the conspiracy's activities.  In particular, his decisionmaking authority over the procurement of equipment, supplies, and chemical ingredients demonstrated his leadership role in the conspiracy.  Whitehurst Sentencing Tr. at 116-17 (October 10, 1996).

Neither was the District Court's failure to grant Coleman, Gessaman, and Ward mitigating-role adjustments clear error, in light of each defendant's involvement in the drug operation.  Coleman was "the distributor of the methamphetamine and an 'enforcer' of the conspiracy, collecting currency for Whitehurst."  Coleman Presentencing Report at ¶ 18 (adopted by District Court, Coleman Sentencing Tr. at 133 (September 20, 1996)).  Gessaman helped purchase ingredients and cook the methamphetamine.  Ward made the propane tank and the stainless steel container used to cook the methamphetamine.  The record supports the District Court's determination

-12-

of each defendant's role in the conspiracy and its evaluation that none of them was a minor or minimal participant.

## V.  Obstruction-of-Justice Enhancement

We also affirm the District Court's enhancement of Coleman's, Ward's, and Whitehurst's offense levels for obstruction of justice.  The Sentencing Guidelines provide for a two-level increase in offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense . . .."  U.S.S.G. § 3C1.1 (1997).  The enhancement applies when the defendant has participated in destroying or concealing material evidence.  Id., commentary, n.3(d).  The defendants rely on the Guidelines' further direction that, if such conduct occurs contemporaneously with the defendant's arrest, the enhancement does not apply unless it resulted in a material hindrance to investigation, prosecution, or sentencing.  Id.  However, the District Court found, and we agree, that even if the defendants' burning of the farmhouse could be considered contemporaneous with their arrest, the total destruction of the farmhouse and a "substantial amount of potential evidence" constituted a material hindrance within the meaning of the Guidelines.  Coleman Sentencing Tr. at 130 (September 20, 1996). Further, the District Court followed the Sentencing Guidelines' approach to grouping closely related counts by grouping Counts II and III (use of fire to destroy property used in interstate commerce and destruction of property to prevent seizure of evidence) with Count I (conspiracy to manufacture methamphetamine), the most serious offense. See U.S.S.G. § 3D1.2 (1997).  Thus, the enhancement did not represent double counting and was properly applied.

## VI.  Safety-Valve Adjustment

Gessaman argues that the District Court erred in failing to decrease her offense level pursuant to U.S.S.G. § 2D1.1(b)(4),[5] which reduces the offense levels of defendants meeting the criterion for the safety-valve exception to statutory minimum sentences in U.S.S.G. § 5C1.2.  We hold that she was disqualified from the decrease by her possession of weapons connected to the drug conspiracy.

Among other criteria, the "safety valve," and hence the  § 2D1.1(b)(4) decrease, requires that "(2) the defendant did not . . . possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense . . .." U.S.S.G. § 5C1.2(2) (1997).  The District Court found that Gessaman failed to meet this criterion because of the 14 guns found during a traffic stop in December 1994,[6] as well as the ten guns found at the farmhouse in December 1995.[7]  As with a weapon-possession enhancement, which Gessaman also received, defeating the safety-valve decrease requires the government "to prove by a preponderance of the evidence that it is not clearly improbable that the weapon had a nexus with the criminal activity." United States v. Richmond, 37 F.3d 418, 419 (8th Cir. 1994), cert. denied, 513 U.S.

---

[5]Effective November 1, 1997, the applicable Guideline is now found at U.S.S.G. § 2D1.1(b)(6).

[6]Gessaman's Fourth Amendment challenges to the use of these guns against her are addressed below.

[7]The presentencing report also found that Gessaman failed to satisfy factor (5) of the safety-valve test, which requires the defendant to have "truthfully provided to the Government all information and evidence [she] has concerning the offense or offenses . . . ." U.S.S.G. § 5C1.2(5) (1997).  Because the District Court correctly determined that Gessaman's possession of weapons disqualified her from the safety valve, it did not reach this second issue, and we need not do so now.

1178 (1995).  The firearms in the farmhouse were found in "strategic positions, suggesting that their intended use was for protection of the residence and the

methamphetamine laboratory"; during Austin's controlled delivery of iodine to the farmhouse, Gessaman said that he should have contacted the farmhouse in advance "to avoid the possibility of being shot"; and numerous of the firearms found in the car in 1994 "were not commonly associated with a sporting activity." Addendum to Gessaman Presentencing Report at 5 (adopted by District Court, Gessaman Sentencing Tr. at 173 (April 9, 1997)). In light of this evidence, the District Court's denial of a safety-valve adjustment was not clear error.

## VII. Criminal History Category

The government concedes that Coleman should have been placed in Criminal History Category I for sentencing purposes. We therefore remand for resentencing using the correct category.

## VIII. Arguments for Retrial

### A. *Ineffective Assistance of Counsel*

Coleman argues that the ineffective assistance of his counsel at trial violated his Sixth Amendment rights. Such a claim should normally be raised not on direct appeal but in a 28 U.S.C. § 2255 proceeding, so that a record can be developed properly by the District Court. United States v. Kenyon, 7 F.3d 783, 785 (8th Cir. 1993). We decline to address arguments at this stage.

### B. *Trial Errors*

Ward claims that the District Court committed various errors during his trial, and also that the evidence presented at trial was insufficient to support his conviction. We have considered these claims and find them to be without merit.

-16-

## IX.  Search and Seizure Issues

Whitehurst argues that the District Court erred in admitting into evidence guns and drugs seized during a traffic stop in December 1994, on Fourth Amendment grounds.  Similarly, Gessaman challenges the District Court's consideration of this evidence at her sentencing.  We hold that the search of the car and the seizure of the guns and drugs found therein were constitutional.

On December 3, 1994, Gessaman was stopped for a traffic law violation.  Police observed a handgun clip protruding from under the passenger seat.  They asked Gessaman and Whitehurst, who was her passenger, to leave the car and to sit in separate police cars, which they did.  The police then retrieved the clip from the car and, in the process, observed a gun under the back seat.  They proceeded to search the van, finding ten bottles of ephedrine, 14 guns, and ammunition in the back of the van, as well as other firearms and drugs.

Traffic violations constitute probable cause for police to stop a car,  United States v. Cummins, 920 F.2d 498, 500 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991), as well as to order the driver and passengers out of the car, Maryland v. Wilson, 117 S. Ct. 882, 884 (1997).  The police's observation of the clip justified a limited sweep of the passenger compartment.  See United States v. Richards, 967 F.2d 1189, 1193 (8th Cir. 1992).  Thus, the gun under the back seat, and the drugs and guns in the back of the van, were validly seized.

## X.

We affirm the sentences of Gessaman, Ward, and Whitehurst.  We remand Coleman's case for resentencing according to his correct Criminal History Category.

It is so ordered.

A true copy.

      Attest:

                CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.