# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 00-2563

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff/Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| | * | Western District of Missouri |
| v. | * | |
| | * | |
| Raymond G. Thomas, | * | |
| | * | |
| Defendant/Appellant. | * | |

Submitted: January 10, 2001

Filed: May 2, 2001

———————

Before RICHARD S. ARNOLD and BOWMAN, Circuit Judges, and KYLE, District Judge.[1]

KYLE, District Judge.

Defendant/Appellant Raymond G. Thomas appeals from a final judgment entered in the United States District Court for the Western District of Missouri pursuant to Thomas's conditional guilty plea to armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d), and to the use of a firearm during a crime of violence, in violation

———————

[1] The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

of 18 U.S.C. § 924(c). Thomas was sentenced to ninety-three months' imprisonment. He appeals from the district court's[2] denial of his motion to suppress evidence. We affirm.

## I.

On July 7, 1999, an off-duty Independence, Missouri, police officer, Michael Barber, was in the drive-through lane of the United Consumers Credit Union when he observed a person inside the bank going through the bank's money drawers, and two female bank employees with their hands in the air. He then observed the person walk over to the drive-through counter, take something out of money drawers located near the drive-through, and exit the bank.

Officer Barber, using his cellular phone, called and advised the police dispatcher that there was a robbery in progress. He then pulled his car around to the front of the bank where he observed the person drive away on a white motorcycle. He followed the motorcycle to what he knew to be an enclosed parking lot. Upon entering the parking lot, Officer Barber lost sight of the motorcycle and approximately fifteen seconds later saw a white van pull out of the area where he had last seen the motorcycle and head towards the only exit in the lot. Based on his having knowledge of the use of secondary vehicles in bank robberies, and having observed no other traffic in the parking lot, Officer Barber advised dispatch that the suspect was now driving a white van.

Based on the information Officer Barber gave the dispatcher, two on-duty police

---

[2] The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri, adopting the Report and Recommendation of the Honorable John T. Maughmer, Chief United States Magistrate Judge, for the Western District of Missouri.

officers, Steven Warren and Scott McKee, pulled the van over and ordered the driver out of the van by gunpoint. The driver exited the van and was ordered to the ground by Officer Warren. Officer McKee then searched the inside of the van in order to ensure that there were no other occupants in it. In that search, Officer McKee and another officer, Brett Duncan, had to pull down a white sheet, located behind the front seats, in order to see what was in the back of the van. The officers did not find any occupants but did find a white and blue motorcycle, a ramp, a rain slicker, a camouflage hunter's mask, a net, a Bearcat police scanner, a fanny pack, currency, and a gun.

After Officer McKee informed Officer Warren that the van was "clear" of any occupants, Officer Warren asked the suspect if he knew why he had been stopped, and the suspect responded "Yeah, I just committed a robbery."[3] Officer McKee also informed Officer Warren of what he had found in the van and Officer Warren placed the suspect (later identified as Thomas) under arrest. After the arrest, Thomas told Officer Warren that he had committed the robbery because of a medical condition. Once Thomas was placed in the back of Officer McKee's squad car, Thomas asked Officer McKee how they had "come on to him." Officer McKee did not respond.

Detective Michael Johan arrived shortly after Thomas was placed under arrest. The detective asked Thomas what his name was and Thomas replied that he went by Greg, and that he had committed the robbery because of terrible headaches. Detective Johan did not respond. Thomas also requested on the ride to the police station that the detective inform the tellers that he was sorry. Detective Johan responded that he had some pen and paper and Thomas could write the tellers a note

---

[3] The parties dispute whether Officer Warren asked the question of Thomas before Officer McKee had searched the van or following the search. The district court found that the search of the van preceded the question by Officer Warren.

of apology, but Thomas stated he would do it later.[4]

Thomas was not advised of his <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) (hereinafter <u>Miranda</u>), rights until he arrived at the police station where Detective Johan intended to ask him direct questions regarding the robbery. Thomas refused to sign a form waiving his <u>Miranda</u> rights, and later invoked his rights.

Prior to trial, Thomas filed a motion to suppress his incriminating statements and the physical evidence found in the van. Thomas argued before the magistrate judge that the stop was unlawful, and that Thomas's statements and the physical evidence found in the van were the fruit of the unlawful stop. The district court, adopting the magistrate judge's Report and Recommendation, denied Thomas's motion.

II.

Thomas now argues that the district court erred in refusing to suppress his statements because the statements were made while in custody and in response to interrogation without a <u>Miranda</u> warning.[5] Thomas further contends that his <u>Miranda</u>-tainted statement provided the probable cause to search his van and, therefore, the search was the fruit of the unlawful statement. It appears, however, that Thomas no longer asserts that the stop was unlawful. We review the district court's factual findings for clear error and its determinations of probable cause and reasonable suspicion de novo. <u>United States v. Beck</u>, 140 F.3d 1129, 1133 (8th Cir. 1998).

---

[4] In this appeal, Thomas does not dispute the use by the government of these statements.

[5] Although Thomas's counsel stated at the suppression hearing that Thomas was only asserting the theory of an unlawful stop to suppress the evidence, Thomas's counsel contends that it became clear at the hearing that Thomas was also challenging the incriminating statements on the grounds that they were the result of an unlawful custodial interrogation.

The district court found that the stop of the van was lawful based on the information received from the off-duty officer who had witnessed the robbery, and that concern for officer safety justified the protective sweep of the van. The district court did not address whether Thomas's statement in response to Officer Warren's question "Do you know why you were stopped?" was the product of an unlawful custodial interrogation, as the government indicated that it did not intend to use this statement in its case-in-chief.

An investigatory, or Terry, stop without a warrant is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot. Terry v. Ohio, 392 U.S. 1, 21 (1968). During a Terry stop, officers can check for weapons and may take any additional steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 232 (1985); see also United States v. Doffin, 791 F.2d 118, 120 (8th Cir. 1986). In deciding whether to conduct a Terry stop, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation. See United States v. Robinson, 119 F.3d 663, 666-67 (8th Cir. 1997).

After reviewing the evidence, we find that the officers had sufficient reasonable suspicion to stop Thomas. Reasonable suspicion "is a 'particularized and objective basis' for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The officers were acting on information from an off-duty police officer who had witnessed a robbery, followed the suspect to an enclosed parking lot, observed no other activity in the lot, observed a white van leaving from the same part of the lot the motorcycle entered, and, based on his familiarity with the practice of robbers using secondary vehicles as part of their get-away, was reasonably certain that the suspect had switched vehicles in the parking lot, and was driving a white van. The on-duty officers, having located a white van with the vehicle of the off-duty officer following

-5-

it, had sufficient reasonable suspicion that the driver of the van had just committed a crime. Accordingly, the district court did not err in concluding that the stop was based on reasonable suspicion.

III.

Once the officers stopped the van and had the driver detained, Officers McKee and Duncan executed a search of the van for additional occupants. Thomas argues on appeal that the search of the van followed the question by Officer Warren regarding why Thomas had been stopped; thus, probable cause to search the van was dependent on Thomas's answer. The district court, however, found that Officer Warren's question to Thomas occurred <u>after</u> Officer McKee stated that the van was "clear," and that the search of the van was a lawful protective sweep for the officers' personal safety. We review the district court's factual finding that Officer Warren's question came after the protective sweep for clear error and its determination that the search of the van was a lawful protective sweep de novo. <u>Beck</u>, 140 F.3d at 1133.

The district court's finding that Officer McKee's search of the van preceded Officer Warren's question is supported by the record below. Officer Warren testified at the suppression hearing that "after we had cleared the van to make sure there was no other occupants in the van, . . . , I had holstered my gun, and I had just looked down at the suspect, and I'd asked him, 'Do you know why you've been stopped.'" (T. 46.) We conclude that this testimony is sufficient to support the district court's factual finding.

Having found that Thomas's statement to Officer Warren occurred after the search of the van, the district court concluded that the search of the van was a lawful protective sweep. The court further found that concerns for the officers' personal safety clearly justified the search of the van to confirm there was no one else inside the vehicle. After stopping a suspect, officers may take such "additional steps as are

-6-

'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" Doffin, 791 F.2d at 120 (quoting Hensley, 469 U.S. at 236).

Based on the information provided by the off-duty officer, the officers had reasonable suspicion to believe that Thomas had just committed an armed bank robbery. In order to protect their safety while they stopped Thomas, the officers needed to ensure that others would not be emerging from the van. Unlike the typical vehicle, the officers could not see inside the van from the outside, making it necessary to enter the van to determine if it contained additional occupants. In sweeping the van it became necessary to push aside a sheet hanging behind the driver and front passenger van seats. The area hidden by the sheet was large enough to hide other occupants in the van. Upon moving the sheet, the officers did not find a person but observed instead a blue and white motorcycle and additional evidence from the bank robbery.

We agree with the district court that the search of the van was reasonably necessary for the officers' personal safety in conducting the stop because other occupants in the van could pose a significant danger to the officers. Thus, having lawfully been in the van searching for occupants, the items that were in plain view of the officers could be seized as evidence without a warrant.[6] See United States v. Hughes, 940 F.2d 1125, 1126-27 (8th Cir. 1991).

For these reasons, we affirm the district court's denial of Thomas's motion to suppress.

---

[6] Thomas also challenges the use of his statement, "Yeah, I just committed a robbery," on the grounds that it was a custodial interrogation without first being advised of his Miranda rights. The government, however, responded at the suppression hearing that it did not intend to use Thomas's statement in its case-in-chief. The district court, therefore, did not reach the merits of Thomas's claim. We, likewise, need not reach the merits of this claim.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.