# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3741

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Respondent - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Brian E. Spotts, | * | |
| | * | |
| Petitioner - Appellant. | * | |

Submitted: May 15, 2001

Filed: January 3, 2002

_____

Before LOKEN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Nebraska police stopped Brian Spotts's truck as he drove by a residence that DEA agents were searching for a methamphetamine lab. The police had seen the truck at the same residence the night before, one of a series of suspicious visitors, and they had reports that Spotts dealt methamphetamine. A bag of methamphetamine and a pistol were plainly visible inside the stopped truck. The officers' discovery of these items prompted Spotts to make incriminating statements. Spotts pleaded guilty to possessing methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1) (1994), and possessing a firearm during the commission of a crime, 18 U.S.C. § 924(c)(1)

(1994) (now 18 U.S.C. § 924(c)(1)(A) (Supp. V 1999)), but retained the right to appeal the district court's[1] order ruling that the evidence obtained from the stop of his vehicle was admissible at trial. Spotts argues that the district court should have suppressed the evidence because the stop was not supported by the reasonable suspicion required by Terry v. Ohio, 392 U.S. 1 (1968), and its progeny. We affirm the district court's order.

I.

The stop at issue took place on the street outside the Hughes residence on First Street in North Platte, Nebraska. Police had arrived there some hours earlier to perform a warrant-supported search of the Hughes premises. Spotts was not mentioned in the search warrant, but his vehicle was seen at the property on the night before the search. Both the search and the surveillance that preceded it are therefore circumstances relevant to whether the police reasonably could have suspected Spotts of wrongdoing when they stopped him. See United States v. Robinson, 119 F.3d 663, 667 (8th Cir. 1997) (upholding validity of Terry stop of vehicle, due in part to police observations of suspected drug house next to which defendant stopped his car).

We state the facts as recited in the magistrate judge's report and recommendation, which the district court adopted in full, and from the district court's opinion, which made additional findings. In addition, where the court below made no findings on a given factual matter we take note of record evidence that is uncontradicted. See, e.g., Solfanelli v. Corestates Bank, N.A., 203 F.3d 197, 200-01 (3d Cir. 1999); Holt v. Winpisinger, 811 F.2d 1532, 1539 (D.C. Cir. 1987).

---

[1] The Honorable William G. Cambridge, Chief United States District Judge for the District of Nebraska (now retired), adopting the report and recommendation of the Honorable Kathleen A. Jaudzemis, United States Magistrate Judge for the District of Nebraska.

L. P. Yonkey, a Nebraska state trooper, lived near the Hughes house. On September 26, 1997, Yonkey noticed a strong smell of ether while standing in his back yard. The smell recurred on three out of the next four nights, seeming to arise at times when the lights were on in a garage on the Hughes property.

Yonkey told the state police of his observations. A second officer, Investigator Gary Eng, arrived to investigate shortly after midnight on September 30. Eng, too, noticed an ether smell that seemed to come from the Hughes garage. Since he knew that a step in the manufacture of methamphetamine involves ether, Eng suspected the presence of a methamphetamine lab. At one point on that night, the officers saw several men standing outside in the Hughes back yard smoking cigarettes, a detail Eng also considered pertinent because ether is highly flammable, making those who operate a methamphetamine lab take care not to bring lit cigarettes near the "works."

The police put the Hughes premises under formal surveillance on October 1, 1997. In the course of that day and night they saw several cars drive into a narrow street, or alley, behind the Hughes garage, stop briefly, and then drive on within minutes. During one stop, the police saw Joe Hughes, one of the residents, emerge from the house and accept cash from a vehicle's driver. The police concluded that this exchange looked like a drug transaction.

Another visitor later that night drove a two-colored Blazer truck, which also stopped in the alley behind the garage. A check of the Blazer's license plate number established that it was registered to Spotts. Shortly after the truck drove up, the officers observed Spotts standing in the alley next to the truck. Spotts bent down and shone a light underneath his vehicle. He then got back in the truck and drove away. Spotts stayed for only a few minutes. The officers did not see him enter the Hughes house or garage or speak with anyone from the house.

At the time the Blazer made its first appearance at the Hughes property, the police possessed several "intelligence reports" stating that Spotts was distributing methamphetamine in the North Platte area. Informants had also reported that Spotts carried a 9mm handgun.

On the basis of these observations, the officers obtained a warrant to search the Hughes garage and house for a methamphetamine lab and other controlled substances. They executed the search warrant on the evening of October 2, 1997, with the aid of federal DEA agents. A specialized DEA lab team made the initial entry. Its investigation of the site took a substantial amount of time. As a result of the search, the police seized a small amount of marijuana from the house, as well as two scales, several pipes, and a forceps. They found no methamphetamine, nor did they find a methamphetamine lab in the garage. The police report on the search, admitted as evidence at Spotts's suppression hearing, contains a statement that the garage smelled of ether at the time of the search and that Joe Hughes's hands were discolored with what an officer identified as "red phospherus [sic] stains."

Approximately three hours after the search began, Spotts's truck returned to the scene. Spotts stopped at a stop sign, then turned on to First Street. He drove down the street at a relatively slow speed, passing in front of the Hughes property. Investigator Eng and two uniformed Nebraska troopers were standing in front of the house. When they recognized Spotts's truck from the previous night's watch, the officers waved a flashlight and signaled Spotts to stop. Spotts did so, then opened the door of his truck. The officers asked Spotts to get out of the truck. One of the officers then peered into the vehicle's interior through the open door. A plastic bag of light-colored brownish powder was visible on the floor board, as was a 9mm gun tucked into the side of the driver's seat. The officers seized these items and arrested Spotts. He later gave a detailed confession admitting that he owned the gun and was involved in selling methamphetamine.

II.

The Fourth Amendment permits police to make an investigative stop of a vehicle if they have a "reasonable suspicion that the vehicle or its occupants are involved in criminal activity." United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). Police must have a "particularized and objective basis" for suspecting criminal activity at the time the stop is made, United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001) (quoting Ornales v. United States, 517 U.S. 690, 696 (1996)), but the standard employed is less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit. Alabama v. White, 496 U.S. 325, 330 (1990).

We review de novo the question whether the facts in Spotts's case add up to reasonable suspicion. Robinson, 119 F.3d at 666. We review for clear error the factual findings of the district court, Thomas, 249 F.3d at 728, including the findings of the magistrate judge, whose report the district court adopted. See United States v. McClinton, 982 F.2d 278, 279 (8th Cir. 1992).

The validity of an investigatory stop under the Fourth Amendment turns on the detailed facts of the case at hand. We must consider "the totality of circumstances – the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981).

The government emphasizes the similarities between this case and Robinson, where we upheld an investigatory vehicle stop that was likewise justified by the defendant's visit to a suspicious residence and the existence of tips. In Robinson the police stopped the defendant's car as he was driving away from a known crack house. The police had an arrest warrant for one of the residents and warrants to search the house itself. Id. at 665. The police also observed apparent drug sales on the

premises: cars pulled up briefly in front of the house, exchanged something with one of the residents, and left. Robinson then drove up to the suspect house, left his car, and walked toward the residence, though the police could not see whether he entered it. The police recognized Robinson as a past drug offender with a criminal history. A reliable informant had also informed them that Robinson had recently made a large drug purchase. Two minutes later Robinson returned to his car and left. The police stopped Robinson in his car shortly after he left and found crack cocaine on his person. Id. at 665-66. We held that "[a]ll of this information created a reasonable and articulable suspicion that [Robinson] had just engaged in a drug transaction," and so upheld the admissibility of the evidence gained from the vehicle stop. Id. at 667.

Several of the elements held to justify the stop in Robinson are present in this case. Here, the police stopped Spotts's truck[2] when he appeared (a second time) at a house that was under surveillance for suspected drug activity, and where the police had previously witnessed at least one apparent drug sale. Similarly, in Robinson the police stopped the defendant as he left a house where the police had observed drug sales. In both cases the defendant was seen outside of his car near the suspect residence and departed after a short time. Finally, in both cases the police testified that at the time of the stop they possessed information from informants indicating that the defendant was involved in drug activity.

We believe, though, that the evidence in Robinson was somewhat stronger than that here. The police saw Robinson approach the suspect residence before they

---

[2] The police also caused Spotts to get out of the truck before looking into its interior. However, this inconvenience does not affect the potential admissibility of the evidence seized from the truck. Officers who have conducted a lawful Terry stop of a vehicle may order the driver to exit the vehicle pending completion of the stop. United States v. Ibarra-Sanchez, 199 F.3d 753, 761 (5th Cir. 1999); see Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam); United States v. Williams, 714 F.2d 777, 781 n.4 (8th Cir. 1983).

stopped him. Here, Spotts was not seen to approach the Hughes house or garage, though he was seen outside of his car near the garage and he drove by the house on a second occasion. Also, in Robinson it was clear that the suspicions of the police in Robinson were buttressed by reliable information from a known informant. Lastly, in Robinson's case police had actually engaged in controlled purchases of crack at the house in question before they spotted Robinson's car there. The evidence of drug sales at the Hughes house was less direct: no methamphetamine was found, only a small quantity of marijuana.

Nevertheless, the evidence of drug crime on the Hughes property was substantial, and strong enough to establish probable cause for the search. And while the search found no drug lab currently operating, the police did find reason to believe that one had been present earlier. As noted above, the officers smelled ether inside the garage during the search, and they saw what they believed to be red phosphorus stains on the hands of Joe Hughes. Red phosphorus is a precursor ingredient used in making methamphetamine. See, e.g., United States v. Coleman, 148 F.3d 897, 900, 901 (8th Cir. 1998) (identifying ephedrine, iodine, and red phosphorus as methamphetamine ingredients). In addition, the DEA and the police recovered several items which are commonly used in drug activity, including pipes, scales, and forceps, in addition to the illegal marijuana.

When a suspect approaches or seeks admission to a likely drug house that is being searched, moderate evidence connecting that person with the house has been held to support a Terry stop. Thus, in United States v. Patterson, 885 F.2d 483 (8th Cir. 1989), a suspect, Patterson, drove up to a house where police were carrying out a warrant-backed search for drugs. When Patterson appeared, the searchers had found drug paraphernalia and "evidence of an ongoing narcotics operation" in the house, but no drugs (not even marijuana, as in Spotts's case). The house's owner, Williamson, was present and had a criminal history. Patterson drove up in Williamson's van, got out, then walked up to the house. Police then stopped and

frisked him, discovering an illegal gun. <u>Id.</u> at 484. We upheld the stop and the seizure. <u>Id.</u>

Some courts have gone further. Pulling up next to a drug house during a search established reasonable suspicion by itself in <u>United States v. Harvey</u>, 897 F.2d 1300 (5th Cir. 1990), <u>overruled in part on other grounds</u>, <u>United States v. Lambert</u>, 984 F.2d 658 (5th Cir. 1993). There, police stopped a car that pulled up in an alley adjacent to a house where police were searching for drugs. At the time of the stop the police had found drugs and firearms on the premises. <u>Id.</u> at 1304. Nothing suggested that the police had previously seen the car's driver, Harvey, near the suspected premises, nor did they possess any tips about Harvey from informants. <u>See id.</u> at 1301-02, 1303-04. The Fifth Circuit upheld the stop, reasoning that "the [suspect] house was well known as a place where frequent drug deals were made and . . . [the police] naturally could infer that Harvey had arrived to either buy or sell drugs." <u>Id.</u>

Unlike the defendants in <u>Patterson</u> and <u>Harvey</u>, Spotts had not parked his car at the Hughes house at the time the police detained him. However, he had stopped at the Hughes property on the preceding night. Spotts's failure to stop the second time must also be considered in context: Although it was nighttime, a large DEA and police team was on the premises. Indeed, three police officers, two of them uniformed, were standing in the front yard at the time Spotts slowly drove by.

We conclude that the series of events that the police and the DEA observed at the Hughes property contributed to providing a sufficient basis of suspicion to justify stopping Spotts.

## III.

The observations did not stand alone. They were bolstered by the officers' possession of information that Spotts dealt in methamphetamine. The strength of such information depends on its source, its specificity, and its level of corroboration. A tip from a known informant can suffice by itself to establish reasonable suspicion for a vehicle stop, even if the police do not corroborate the tip prior to the stop with their own independent observation. See Adams v. Williams, 407 U.S. 143, 146-47 (1972). An anonymous tip can also provide reasonable suspicion by itself, see Alabama v. White, 496 U.S. 325, 329 (1990), but only if it is sufficiently corroborated at the time of the stop, see Florida v. J.L., 529 U.S. 266, 270 (2000). We therefore turn to the district court's findings about the kind of information the officers possessed when they stopped Spotts.

Investigator Eng testified that the police had "several intelligence reports" about Spotts's drug selling, and information from "informants" about his possession of a gun. The magistrate judge drew on the reports to justify the stop of Spotts's truck, referring to them as "intelligence reports" and "informant information." The district court adopted the magistrate's reasoning and made the following additional finding:

> The testimony at the evidentiary hearings indicated that the information that the Defendant was involved with drugs originated from "intelligence reports." This Court finds that such reports amount to more than anonymous tips which must be more closely scrutinized.

Eng's testimony about the several intelligence reports was not clarified, nor indeed was it followed up by further questioning. Challenging the conclusion of the district court, Spotts argues that there was not a sufficient basis in evidence for treating the information given to the police as anything more than anonymous tips.

In view of all of the circumstances before us in this case, we deem it unnecessary to decide whether the district court's finding that the intelligence reports were "more than anonymous tips" was clear error. Instead, we will simply assume that these reports should be viewed only as anonymous tips, as this does not alter the final outcome of the case.

Anonymous information requires corroboration before it may provide a basis (at least a sole basis) for reasonable suspicion. In White, the police received an anonymous tip that the suspect, White, would leave a particular building at a particular time, in a particular car, carrying an attache case with cocaine, and would travel to a specific motel. They then saw White leave the building at the predicted time in the car described by the informant, though she did not carry an attache case. White's car did not stop at the motel that the informant had named as her destination, but it neared that motel, at which point the police stopped her and discovered cocaine on her person. The Supreme Court upheld the stop of White's car, holding that "the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion" that White was involved in drug activity. Id. at 331.

The Court in White emphasized that the tipster there had accurately predicted White's behavior after the time of the tip, demonstrating "inside information – a special familiarity with [White]'s affairs" that gave the tip enough reliability to justify the stop. Id. at 332.

In United States v. Johnson, 64 F.3d 1120 (8th Cir. 1995), we held that adequate corroboration of an anonymous tip need not consist of verifying a prediction of future behavior made by the tipster. Id. at 1125 & n.3. The anonymous tip at issue in Johnson reported that two men were transporting cocaine by car. The tipster described the suspects, their car, and the motels where they were staying. The police put the suspects under surveillance and observed their conduct, which corroborated this information in most of its particulars. The officers then made an investigatory

-10-

stop of the suspects' car. We held that the tip had been sufficiently corroborated to establish reasonable suspicion for the stop. Id.

Here the reports, which we treat as anonymous, were that Spotts was distributing methamphetamine in North Platte and had a 9mm gun. The reports of drug dealing were corroborated by the police's observation of Spotts's initial stop next to the Hughes garage, where they had probable cause to suspect drug activity, plus his second appearance at the property on October 2. See Johnson, 64 F.3d at 1125 (tip partly corroborated by suspect's driving to drug house). This is important because it specifically corroborated an informant's assertion of illegality. See J.L., 529 U.S. at 272.

If this corroboration falls short of the level of detail in White and Johnson, the independent evidence of illegality in Spotts's case is strong enough to bridge that gap. In White there was no other evidence of illegality. The anonymous tip stood alone, so the question before the Supreme Court was simply whether the tip, in and of itself, was sufficiently corroborated to justify a finding of reasonable suspicion. The question before us is different. We confront not only several tips that we are treating as anonymous, but also the independently suspicious observations we have catalogued above. In Johnson, the court's holding appeared to rest purely on the corroborated tip, although the tip was partially reinforced when officers saw the suspects drive to addresses which were "associated with drugs." 64 F.3d at 1125. This would have been suspicious even if there had been no tip. However, there was apparently less detail suggesting ongoing drug activity at the houses in Johnson. Moreover, the opinion in Johnson does not indicate that the suspects exited their cars at the suspicious houses, whereas Spotts did emerge from his truck near the Hughes property.

We hold that the multiple sources of suspicion present in Spotts's case – the partially corroborated intelligence reports, plus Spotts's earlier visit to the Hughes

property, plus the other details (including the search results) observed before the stop of his truck – jointly added up to reasonable suspicion. Taken as a "whole picture," Cortez, 449 U.S. at 417, these facts gave the police an articulable and objective basis to suspect that Spotts was engaged in criminal activity. The stop met the requirements of the Fourth Amendment.

## IV.

Spotts argues that if we uphold a Terry stop on the facts of this case without requiring additional information about the reliability of the police intelligence reports, then as a general matter "the government [will] never lose on a motion to suppress as law enforcement officers . . . would simply be [able] to state, 'we had information that the defendant was involved in drug trafficking.' " We reject this argument. As we have stated, our holding that the stop here was valid rests not solely on the existence of the intelligence reports, but on the reports in conjunction with the officers' independent observations of suspicious activity at the Hughes property, including Spotts's appearances on that property, which are documented in the record and were consistent with the reports about Spotts.

Spotts's quoted argument might also be read as a specific claim that police fabrication occurred in this case. The existence of alleged anonymous or confidential information that supports a police seizure is a question of fact. See United States v. Johnson, 78 F.3d 1258, 1261 (8th Cir. 1996). The district court's resolution of that question therefore binds us unless it is clearly erroneous. Here, the magistrate judge made clear that she believed Investigator Eng's testimony about the existence of the reports. The district court found likewise in adopting her report and recommendation. We see no basis in the record for disturbing the district court's finding, which must rest mainly on a judgment of credibility. See United States v. Heath, 58 F.3d 1271, 1275 (8th Cir. 1995) ("The assessment of a witness's credibility is the province of the trial court.").

## V.

For the foregoing reasons, we affirm the order of the district court.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.